Silverman Perlstein & Acampora LLP
Attorneys for Plaintiff Kenneth P. Silverman, Esq.,
Chapter 7 Trustee
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300
Ronald J. Friedman, Esq. (RJF#1314)
Edward M. Flint, Esq. (EMF#7001)
Mark J. Friedman, Esq. (MJF#9801)

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
In re:

      ALLOU DISTRIBUTORS, INC., et al.,          Chapter 7
                                              Case No. 03-82321 (MLC)
                    Debtors.          (Substantively Consolidated)

--------------------------------------------------------------------x
KENNETH P. SILVERMAN, Esq., as Chapter 7
Trustee of ALLOU DISTRIBUTORS, INC. et al.,

                    Plaintiff,

                                        Adv. Pro. No. 05-08109 (MLC)

          - against -

H.I.L. ASSOCIATES LTD., TEREZA
MERCHANDISING CORPORATION, MORGREN
CONSTRUCTION CORP., ISRAEL GREENFIELD,
HERBERT GREENFIELD and THE ESTATE
OF MORRIS GREENFIELD, deceased,

                    Defendants.
--------------------------------------------------------------------x

### AMENDED COMPLAINT

      Plaintiff, Kenneth P. Silverman, Esq., the chapter 7 trustee (the "Trustee") of the substantively consolidated estates of Allou Distributors, Inc., et al. (collectively, the "Debtors" or "Allou"), by his attorneys, Silverman Perlstein & Acampora LLP, for his amended complaint against defendants H.I.L. Associates Ltd., Tereza Merchandising Corporation, Morgren Construction Corp., Israel Greenfield, Herbert Greenfield and The Estate of Morris Greenfield, deceased, alleges as follows:

MJF/D182750v3F046378

## The Nature Of The Adversary Proceeding

1.    This adversary proceeding is commenced pursuant to 11 U.S.C. §§105, 544, 547, 548, 550, and 551, New York Debtor and Creditor Law §§273, 274, 275, 276 and 276-a, and New York common law to set aside and recover certain fraudulent transfers made by Allou to defendants and to recover damages for aiding and abetting fraud perpetrated against Allou.

## Jurisdiction and Venue

2.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§157 and 1334.

3.    The statutory predicates for the relief sought herein are 11 U.S.C. §§105(a), 544, 548 and 550, New York Debtor and Creditor Law §§273, 274, 275, 276 and 276-a, and New York common law.

4.    This is a core proceeding pursuant to 28 U.S.C. §§157(b)(1), 157(b)(2)(A), 157(b)(2)(E), 157(b)(2)(F), 157(b)(2)(H), and 157(b)(2)(O).

5.    Venue is proper in this Court pursuant to 28 U.S.C. §1409.

## The Parties and Related Entities

### The Debtors

6.    Allou Distributors, Inc. ("ADI") is a New York corporation with its principal offices in Brentwood, New York.  Allou Healthcare, Inc., formerly known as Allou Health & Beauty Care, Inc. ("AHI") is a publicly traded Delaware corporation and is the direct or indirect parent of each of the Debtors.  The Debtors were a major distributor of health and beauty aid products, pharmaceuticals, fragrances and cosmetics.

### The Debtors' Bankruptcy Cases

7.    On April 9, 2003, three (3) creditors filed involuntary chapter 11 petitions ("Involuntary Petitions") in accordance with §303 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with respect to ADI and three (3) of its affiliates, M. Sobol, Inc.

("Sobol"), Stanford Personal Care Manufacturing, Inc., ("Stanford") and Direct Fragrances, Inc. ("Direct," and collectively with ADI, Sobol and Stanford, the "Original Debtors").

8.     Immediately upon the filing of the Involuntary Petitions, the Original Debtors consented to entry of orders for relief under chapter 11 of the Bankruptcy Code as being in the best interests of their creditors and estates.   On April 10, 2003 (the "Petition Date"), the Bankruptcy Court entered Orders for Relief in each of the Original Debtors' chapter 11 cases.

9.     Additional Allou affiliates thereafter were the subject of involuntary chapter 11 petitions.   On April 18, 2003, involuntary chapter 11 petitions were filed against Trans World Grocers, Inc. ("TWG"), Rona Beauty Supplies, Inc., ("RBS"), and AHI.   On May 1, 2003, the Bankruptcy Court entered Orders for Relief in the chapter 11 cases of TWG and RBS.

10.     On April 25, 2003, Core Marketing, Inc., Pastel Cosmetic & Beauty Aids, Inc., HBA Distributors, Inc., and HBA National Sales Corp. (collectively, together with TWG and RBS, the "Subsequent Debtors"), all subsidiaries of Allou, each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

11.     On May 29, 2003, the Bankruptcy Court entered an order directing the appointment of a chapter 11 Trustee for the original Debtors, TWG, RBS and the Subsequent Debtors.   Thereafter, by Order dated May 30, 2003, the Bankruptcy Court approved the selection of the Trustee as Interim chapter 11 Trustee.

12.     By Consent Order dated June 11, 2003, AHI consented to, and the Bankruptcy Court ordered, the entry of an order for relief against AHI, the joint administration of AHI's case with those of the Original and Subsequent Debtors and the appointment of the Trustee.

13.     On September 16, 2003, the Bankruptcy Court converted each of the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.

14.     On December 22, 2003, the Bankruptcy Court ordered the substantive consolidation of the Debtors' cases.

15.    The Trustee has been selected as chapter 7 Trustee of each of the Debtors' chapter 7 cases and has duly qualified and is the permanent Trustee of the Debtors' estates.

**The Defendants**

16.    Upon information and belief, defendants H.I.L. Associates Ltd. ("HIL"), Tereza Merchandising Corporation ("Tereza") and Morgren Construction Corp. ("Morgren"), (collectively the "Corporate Defendants") are New York corporations with offices at 1484 46th Street, Brooklyn, New York.

17.    Israel Greenfield ("I. Greenfield") is an individual with a business address at 1484 46th Street, Brooklyn, New York.  Upon information and belief, I. Greenfield is the President and/or a director of each of the Corporate Defendants and is a controlling person for each of the Corporate Defendants.

18.    Herbert Greenfield ("H. Greenfield") is an individual with a business address at 1484 46th Street, Brooklyn, New York.  Upon information and belief, H. Greenfield is an officer and/or a director of each of the Corporate Defendants and is a controlling person for each of the Corporate Defendants.

19.    Upon information and belief, The Estate of Morris Greenfield (the "Estate"), deceased, is the probate estate of Morris Greenfield ("M. Greenfield").  Morris Greenfield was an officer of HIL and Tereza and was an authorized signatory on the bank accounts of HIL and Tereza.  Upon Information and belief, until his death, M. Greenfield controlled defendants HIL and Tereza.   The Corporate Defendants, I. Greenfield, H. Greenfield and the Estate are hereinafter collectively referred to as the "Defendants."

20.    Upon information and belief, at all relevant times, I. Greenfield and/or H. Greenfield and/or M. Greenfield made all material decisions regarding the transactions described in this complaint and caused the Corporate Defendants to affect such transactions.

**The Jacobs**

21.    At all relevant times, Victor Jacobs a/k/a Victor Jacobowitz ("Victor") and his two sons, Herman Jacobs a/k/a Herman Jacobowitz ("Herman") and Jacob Jacobs a/k/a Jack Jacobs a/k/a Jacob Jacobowitz a/k/a Jack Jacobowitz ("Jacob") (collectively, with Victor's third son, Aaron a/k/a Ari Jacobs, the "Jacobs"), were shareholders of Allou, holding approximately Sixty-One (61%) percent of the voting stock of the publicly traded parent company, AHI.

22.    Victor, Herman and Jacob also held various senior executive positions as officers in AHI.

23.    Victor was Chairman, Herman was Chief Executive Officer, and Jacob was Executive Vice President.

24.    Victor and Herman each also served on Allou's Board of Directors.

25.    At all relevant times, David Shamilzadeh was the President and Principal Accounting Officer of AHI.

26.    On June 30, 2003, three (3) creditors filed involuntary bankruptcy petitions against the Jacobs in the Eastern District of New York Bankruptcy Court at Central Islip.

27.    On August 12, 2003, Herman, Victor, Jacob, and Victor's other son, Aaron Jacobs a/k/a Ari Jacobs ("Ari"), and other accomplices were arrested for, among other crimes, arson and bank fraud.

28.    On September 9, 2003, after extensive proceedings, at which the Jacobs challenged the involuntary petitions, orders for relief were entered against them and Allan B. Mendelsohn, Esq., was appointed as the chapter 7 trustee (the "Jacobs' Trustee").

29.    On or about June 17, 2004, Herman, Victor, Jacob and Ari Jacobs were indicted in connection with their scheme to defraud Allou, which criminal authorities allege to have begun in the mid-1990s and to have increased in magnitude and scope until March 2003 when the fraud was finally exposed.

30.    Upon information and belief, on November 22, 2005, Herman, Jacob and Ari Jacobs pleaded guilty to multiple counts of the indictment and are awaiting sentencing.

**Allou's Independence from Domination by the Jacob's**

**Allou's Independent Directors and Audit Committee**

31.    At all relevant times, Stuart Glasser ("Glasser"), Jeffrey Berg ("Berg") and Sol Naimark ("Naimark") were Allou's independent directors (collectively, the "Independent Directors").

32.    Upon information and belief, at all times relevant, Sol Naimark was, and is, an attorney admitted to practice in the State of New York and a member of the firm of Naimark & Tennenbaum.

33.    Upon information and belief, Berg served as the President of Healthcare Insights, a financial and technology consulting firm, since March 1991.  Berg has a Ph.D. in organic chemistry and an MBA from New York University.  Berg worked in research and development for Johnson & Johnson Products, Inc. and General Foods Corporation.  In addition, Berg served as Senior Analyst Consultant at M.H. Meyerson Co., a brokerage firm, since September 1995, and was also employed by HCFB/Bremmer Securities, a brokerage firm, since May 2002.

34.    At the time Berg was a director of Allou, he also served on the Board of Directors of Bio-Imaging Technologies, Inc., Biologix International Ltd., IMX Pharmaceuticals, Dexterity Surgical, and L.O.M. Medical International.

35.    Upon information and belief, Glasser served as President and Chief Financial Officer of Casual Male Big & Tall and Senior Executive Vice President and Director of J. Baker, Inc., its parent company, a leading specialty retailer of apparel and footwear since August 1997. From 1991 to 1997, Glasser served as Executive Vice President, General Merchandise Manager, for men's, boys and cosmetics areas of Bloomingdale's.  Prior thereto, Glasser was employed by Elder-Beerman Stores, as President for the Department Store Division.

36.    The Independent Directors were not officers or employees of Allou and did not draw any salary or compensation from Allou other than the minimal sums paid to them for their service on Allou's Board of Directors.

37.    The Independent Directors were also members of Allou's audit committee (the "Audit Committee").

38.    Neither the Jacobs nor Shamilzadeh were members of the Audit Committee.

39.    The Audit Committee Charter, adopted unanimously by the AHI Board of Directors on June 12, 2000, established the following obligations of the Audit Committee:

> The primary function of the Audit Committee is to assist the Board of Directors in fulfilling its oversight responsibilities by reviewing the financial reports and other financial information provided by the Corporation to any governmental body or the public; the Corporation's internal controls regarding finance, accounting, legal compliance and ethics that management and the Board have established or may establish; and the Corporation's auditing, accounting and financial reporting processes generally.  Consistent with this function, the Audit Committee should encourage continuous improvement of, and should foster adherence to, the Corporation's policies, procedures, and practices at all levels.  The Audit Committee's primary duties and responsibilities are to:
>
> •    Serve as an independent and objective party to monitor the Corporation's financial reporting process and internal control system.
>
> •    Review and appraise the audit efforts of the Corporations' independent auditors.
>
> •    Provide an open avenue of communication among the independent auditors, financial and senior management and the Board.

40.    The background of each of the members of the Audit Committee demonstrates that each of them had sophisticated business and/or legal backgrounds, such that they would not have simply ignored the Jacobs' fraud if they had known about it, or if they had received any report from Allou's auditors of possible illegal activity by the Jacobs.

41.　Under Section 78(j)-1(b) of the Private Securities Litigation Reform Act ("PSLRA"), among other rules and regulations, auditors of publicly traded companies such as Allou are required to report to the Audit Committee with respect to illegal acts that have been detected or have otherwise come to the attention of the auditor in the course of the audit.

42.　The PSLRA requires the Audit Committee to notify the SEC within one (1) business day of its receipt of the auditor's report and furnish a copy of the report to the SEC.

43.　The Audit Committee is also required to send a copy of the SEC notice to the accounting firm and, in the event the accounting firm does not receive the notice within the one (1) business day period, the accounting firm itself is required to furnish the report to the SEC.

44.　Upon information and belief, based upon the Audit Committee Charter, as members of the Audit Committee, the Independent Directors were required to review and monitor Allou's corporate financial reporting, external audits, internal control functions and compliance with laws and regulations that could have a significant effect on Allou's financial condition or results of operations.

45.　In addition, based upon the Audit Committee Charter, as members of the Audit Committee, the Independent Directors had the responsibility to consider and recommend the appointment of, and to review fee arrangements with, Allou's independent auditors and to discuss any problems its auditors, Mayer Rispler & Company, P.C. ("Mayer Rispler"), Arthur Andersen LLP ("Arthur Andersen") or KPMG LLP ("KPMG") discovered during the course of their audits of Allou's consolidated financial statements.  Mayer Rispler, Arthur Andersen and KPMG are some times hereinafter referred to as the "independent auditors."

46.　The Independent Directors had the power, and the responsibility, to oversee Allou's audits and Allou's financial statement disclosures.

47.　As members of the Audit Committee and in their capacity as directors of Allou, the Independent Directors had access to Allou's internal reports, press releases and public filings.

48.     Similarly, as members of the Audit Committee and in their capacity as directors of Allou, the Independent Directors had the ability and the responsibility to prevent the issuance of erroneous financial statements or to correct Allou's publicly filed financial statements.

49.     The Independent Directors each personally signed the SEC Forms 10-K filed by Allou with the SEC during the time that they were Independent Directors.

50.     Each of the SEC Forms 10K signed by the Independent Directors incorporated Allou's audited financial statements and independent auditor reports with respect thereto.

51.     Accordingly, the Independent Directors had the responsibility, the power and the control over Allou's financial statements and the responsibility and the power to direct or cause the direction of the management and policies of Allou, at least insofar as the management and policies related to ensuring the accuracy of Allou's financial statements, reports and SEC filings that the Independent Directors actually signed.

52.     Based upon the foregoing, the Independent Directors were "control persons" of Allou pursuant to federal securities law.

53.     As Allou "control persons", the Independent Directors had the power and the duty to influence Allou's public disclosures by, among other things, notifying the SEC of the Jacobs' wrongful activities and/or withholding their signatures from publicly filed documents, including but not limited to, Allou's SEC Forms 10K.

54.     As "control persons" of Allou, the Independent Directors had the obligation and the authority to stop the Jacobs' fraud at Allou.

55.     None of the Independent Directors had any financial interest in Allou nor any conceivable motive to risk massive civil and criminal liability by failing to notify the SEC of any such illegal acts reported to them by defendants or that they may have otherwise discovered.

56.     Thus, the Independent Directors could have, and would have, prevented the fraud from continuing by simply complying with the reporting requirements of the PSLRA.

57.    Indeed, since Allou's independent auditors would have been required to report illegal acts to the SEC if the Independent Directors had failed to do so; there is absolutely no reason to believe that the Independent Directors would not have immediately notified the SEC of the fraud.

58.    The fact that the Independent Directors were not so dominated by the Jacobs that they would have simply ignored the fraud is demonstrated by the conduct of the Independent Directors immediately after the serious accounting discrepancies were discovered by Allou's lenders in late March, 2003.

59.    At a board meeting held on April 1, 2003, Independent Directors, Berg and Naimark, approved of the retention by Allou of RAS Management Advisers, Inc. ("RAS"), a crisis management firm of independent professional consultants to take over the management of the company from the Jacobs and investigate the accounting discrepancies.

60.    At the time of the April 1, 2003 board meeting, RAS had barred access to the Allou premises by the Jacobs and changed the locks to the company's offices.

61.    At a board meeting held on April 8, 2005, Independent Directors Berg and Naimark voted to approve the continued retention of RAS and exclusion of the Jacobs, and to consent to the involuntary bankruptcy petitions that were expected to be filed the next day against Allou.

62.    The Jacobs and Shamilzadeh abstained from voting at that meeting, further demonstrating that the Independent Directors were capable of taking positions to prevent the fraud from continuing and that the Jacobs and Shamilzadeh themselves recognized that it would be futile for them to attempt to thwart the Independent Directors of this publicly traded company once the accounting discrepancies were uncovered.

63.    Upon information and belief, the Independent Directors would have, and could have acted to stop the fraud earlier had they known about it by reporting it to the SEC, Allou's

outside counsel, the independent auditors, and/or taking other action that would have resulted in the public disclosure of the fraud.

**Allou's Independent Officers**

64.    In addition to the Independent Directors, Allou had other officers in senior management positions who were innocent of the fraud, and would have, and could have, stopped the fraud if they had known about it.

65.    Ramon Montes ("Montes") was employed with AHI beginning in 1996 as Sales Manager.

66.    In 1998, Montes was promoted to Vice President of Sales and Operations.  In 1989 he was promoted to Executive Vice President and Director, the position he held until 1998, when his title changed to Vice President, Sales.

67.    Montes continued in that capacity until November 29, 2001.

68.    In the AHI prospectuses filed with the SEC on January 27, 1999, Montes, along with the Jacobs and Shamilzadeh, was designated a "key member of our management" for whom Allou obtained "key man" life insurance in the amount of $1 million.

69.    Montes was a highly compensated, key employee of Allou who had the ability and authority to stop the Jacobs' fraud.

70.    Montes was not aware of, and not involved in, the Jacobs' fraud at Allou.

71.    In December 2001, Montes was replaced by Stuart Noyes ("Noyes") who served as Senior Vice President and General Manager.

72.    Previously, Noyes was Vice President of sales and marketing for Fleming Company Inc., a $15 billion NYSE listed company engaged in the business of consumable products.

73.    Noyes employment terminated with the demise of Allou in April 2003.

74.    During the period of his employment, Noyes assumed all of the duties and responsibilities of a senior vice president and general manager of Allou.

75.     Noyes was a highly compensated, key employee of Allou who had the ability and authority to stop the Jacobs' fraud.

76.     Noyes was not aware of, and not involved in, the Jacobs' fraud at Allou.

77.     In addition to Montes and Noyes, Allou had other managers who, although not as highly compensated, nevertheless occupied positions of relevant authority and had the ability and the authority to stop the Jacobs' fraud.

78.     Paul Cohen ("Cohen") was employed by AHI as Director of Pharmaceuticals from in or about 1990 through January 2002.

79.     Cohen was not aware of, and not involved in, the Jacobs' fraud at Allou.

80.     Mark Felman ("Felman") was employed by AHI since 1997 until October 2001 as AHI's Director of Purchasing.

81.     Felman was not aware of, and not involved in, the Jacobs' fraud at Allou.

82.     Jeffrey Rabinovich ("Rabinovich") was Vice President, Chief Systems Analyst and Secretary of AHI since July 2000.

83.     From January 1999 to July 2000, Rabinovich served as Executive Assistant to the President.

84.     Prior to that time, Rabinovich served as Assistant Treasurer at Republic National Bank.

85.     Rabinovich was not aware of, and not involved in, the Jacobs' fraud at Allou.

86.     Joe Adams ("Adams") was President of Direct Fragrances, Inc., one of AHI's larger subsidiaries, since 1998.

87.     Prior to becoming President, Adams was Sales Manager of Fragrance Plus, Inc. since 1984.

88.     Adams was not aware of, and not involved in, the Jacobs' fraud at Allou.

89.     Norman Miller ("Miller") was President of  AHI's pharmaceutical subsidiary, M. Sobol, Inc., since January 2000.

90.     Miller was President of the Pharmaceutical Division of Quality Key Distributors from 1987 through 1995.

91.     Prior to that, Miller held executive positions with Moore Medical Corp., Stanford Superior Drug and Pfizer Pharmaceuticals.

92.     Miller was not aware of, and not involved in, the Jacobs' fraud at Allou.

93.     Shlomo Bistritzky ("Bistritzky") was President of AHI's manufacturing subsidiary, Stanford Personal Care Manufacturing, Inc., AHI's second largest subsidiary, since April of 2002.  Prior to that he was Stanford's Vice President of Sales and Marketing.

94.     Previously, Bistritzky was President of Stamp Art Corporation, a manufacturer of gift products.

95.     Bistritzky was not aware of, and not involved in, the Jacobs' fraud at Allou.

96.     Montes, Noyes, Cohen, Felman, Rabinovich, Adams, Miller and Bistritzky (collectively, the "Innocent Managers") were each sophisticated well-experienced businessmen in senior management positions at Allou.

97.     Upon information and belief, the Innocent Managers would have, and could have, stopped the fraud, had they known about it, by reporting it to the Audit Committee, AHI's outside corporate counsel, their own counsel, the defendants themselves, and/or taking other action that would have resulted in the public disclosure of the fraud.

98.     The fact that the Innocent Managers were not so dominated by the Jacobs that they would have simply ignored the fraud is demonstrated by the fact that Montes, Felman and Cohen (together with Montes' wife who was employed by Allou as a sales representative), commenced an action against AHI, the Jacobs and Shamilzadeh in United States District Court, Eastern District of New York, alleging that the Jacobs and Shamilzadeh had violated various employment and labor laws by terminating them.

99.     There can be no doubt that, if they had known about the fraud, these Innocent Managers would have stopped it, or if the Jacobs tried to prevent them from doing so by

terminating them, they would have sued AHI, the Jacobs and Shamilzadeh for violating their "whistleblower" rights under applicable law including Sarbanes-Oxley.

100.    At that point, the public disclosure of the fraud would have brought the Jacobs' fraudulent activities to an end.

**Allou's Outside Corporate Counsel**

101.    Allou was represented by independent outside counsel, the firm of Jenkens & Gilchrist ("Jenkens").

102.    Upon information and belief, Jenkens prepared AHI's Form 10-Q and 10-K and other SEC filings on behalf of AHI.

103.    In addition, upon information and belief, Jenkens reviewed all reports issued by defendants to the Board of Directors and the Audit Committee, participated in the meetings between the Audit Committee and defendants, and attended the annual stockholders' meetings.

104.    Upon information and belief, if Jenkens had been advised of the fraud, it would have, and could have, stopped the fraud by advising the Independent Directors of their legal obligation to report the fraud to the SEC and/or by complying with its own obligations under Sarbanes-Oxley and its ethical obligations as counsel.

**Allou's Independent Public Shareholders**

105.    At all times relevant, Allou was a publicly traded company that had outside shareholders who held approximately Thirty-Nine (39%) percent of the voting stock of AHI.

106.    AHI held annual stockholders' meetings at the American Stock Exchange in New York City.

107.    Upon information and belief, a representative of the Mayer Rispler firm attended each of those meetings since as early as September 2000, a representative of Arthur Andersen attended the stockholders' meeting held in September 2001, and a representative of KPMG attended the stockholders' meeting held in September 2002.

108.    In addition, the members of the Audit Committee and the Jenkens firm attended each of the stockholders' meetings.

109.    Upon information and belief, the meetings were also attended by independent public shareholders of Allou.

110.    It is clear that the Jacobs were able to continue their fraud for years because AHI's publicly filed consolidated financial statements, its SEC filings and defendants' audit reports failed to disclose to those innocent and interested shareholders the nature and extent of the Jacobs' fraud, or even that there was any material problem with AHI's financial position, trend or internal controls.

111.    The audit reports certainly did not disclose that AHI's financial statements for the years 2000, 2001 and 2002 were materially false and misstated.

112.    The independent public shareholders, some of whom were financial institutions, certainly would have, and could have, stopped the fraud had they known about it by notifying the SEC or exercising their derivative rights as shareholders under Delaware law.

### The Jacobs' Scheme

### Overview of the Scheme

113.    Victor, Herman, Jacob and  Ari, Jacobs, their wives, relatives, accomplices and additional family members (collectively with the Jacobs, the "Jacobs Family") along with others orchestrated and participated in a long-running and massive fraudulent scheme whereby the Jacobs repeatedly caused Allou to misrepresent its financial condition by inflating inventory and accounts receivable records.

114.    Hundreds of millions of dollars advanced to Allou by its lenders was subsequently transferred to other companies owned or controlled by the Jacobs Family to further perpetuate the fraudulent scheme, including: (i) the acquisition of other assets for the benefit of the Jacobs and their cronies, (ii) the waste of Allou's corporate assets, and (iii)

payments to entities bearing names which indicated such entities were charitable institutions while same were simply Jacobs controlled entities.

115.    In addition to personal enrichment, the Jacobs and their cohorts, including the Defendants, used their looting of Allou to enhance their standing in their community.  Victor Jacobs and Defendant M. Greenfield, and after his death, Defendants H. Greenfield and I. Greenfield, and others supported one faction in a schism between competing interests in the Satmar community.  Specifically, there is a succession dispute involving competing supporters of the two (2) sons of Grand Rebbe Moshe Teitelbaum.  The Grand Rebbe is believed to be close to ninety-years old, and his successor has not yet been designated.   The faction supported by the Jacobs and the Greenfields supports Zalman Teitelbaum, while the competing faction supports Aaron Teitelbaum.  As also alleged in other complaints filed by the Trustee, it is believed that a substantial portion of the money looted from Allou was used by the Jacobs, and, in this case, the Greenfields, to aid them in their support of Zalman Teitelbaum and thereby enhance their position in the Satmar community.

116.    In addition to transfers to entities controlled by the Jacobs Family, the Jacobs enlisted the services of unrelated entities controlled by persons with familial, personal and community ties to the Jacobs, including the Defendants.  The Jacobs would cause Allou to enter into fictitious sales to and inventory purchases from the Corporate Defendants and, therefore, were actively aided and abetted by the principals of these entities, including the Greenfields.

117.    The Jacobs Family also enlisted M. Greenfield and H. Greenfield to assist them in looting money from Allou through a real estate condominium development project in Brooklyn located at Kent Avenue Brooklyn (the "Kent Rush Condominiums").   Upon information and belief, as part of the scheme, described more fully below, M. Greenfield asserted phony mortgage liens against certain parcels of the real property comprising the Kent Rush Condominiums and assisted the Jacobs in diverting funds from Allou to the Kent Rush

Condominiums and, in turn, from the Kent Rush Condominiums to the Jacobs and/or entities controlled by the Jacobs.

118.    As set forth more fully below, the fraud perpetrated by the Jacobs at Allou consisted of many components, which separately and collectively, reflected the Jacobs' total abandonment of the interests of Allou for their own benefit and the benefit of their confederates.

119.    The Jacobs' frauds resulted not only in separate, identifiable and significant losses to Allou, but also collectively resulted in the deepening of Allou's insolvency and its ultimate financial demise.

120.    The Jacobs were able to sustain their scheme and to continue to divert substantial funds from Allou only with the assistance of confederates, such as the Defendants.

**The Creation Of Fictitious Accounts Receivable And Inventory**

121.    A component of the Jacobs' fraud at Allou involved the inflation of Allou's accounts receivable and inventory.

122.    Allou's accounts receivable and inventory were falsely and fraudulently inflated through the Jacobs' implementation of two distinct sets of books and records for Allou and through the use of fictitious sales personnel, fictitious vendors and fictitious purchases of non-existent inventory.

123.    Allou filed a form 8-K with the Securities and Exchange Commission on April 24, 2003, indicating that as of that date, inventory was overstated by approximately $35,000,000 and that accounts receivable may have been overstated by $75,000,000 to $80,000,000, for a total overstatement of $110,000,000 to $115,000,000.

124.    The Jacobs fraudulently and artificially inflated Allou's accounts receivable balances by creating tens of millions of dollars of phony invoices.

125.    The creation of fictitious accounts receivable by the Jacobs was directly adverse to the interests of Allou and resulted in, among other things, (a) a material misstatement of Allou's financial condition, business operation and trend, (b) the inability of Allou to make sound

and well founded business decisions or to formulate realistic business models, plans or projections relating to its business and operations, and (c) the incurrence of substantial liabilities by Allou without any concomitant benefit.

126.    Further, the creation of fictitious accounts receivable by the Jacobs was implemented solely to allow the Jacobs to siphon millions of dollars from Allou, which it could not repay, thereby deepening Allou's insolvency.

127.    The Jacobs also fraudulently and artificially inflated Allou's inventory balances by recording sham purchases by Allou from companies affiliated with, or controlled by, the Jacobs and their cohorts, and from the Corporate Defendants.

128.    Between January 2002 and March 2003 alone, the Jacobs caused Allou to record more than $198 million of bogus inventory purchases.

129.    For example, Allou reported inventory purchases from Fleming Company (until recently one of the largest wholesale distributors in America) but paid for those alleged purchases by a check payable to a Jacobs-related entity, Impax Trading Corporation, a/k/a Impax Trading, Inc. ("Impax").

130.    The creation of fictitious inventory purchases by the Jacobs was directly adverse to the interests of Allou and resulted in, among other things, (a) a material misstatement of Allou's financial condition, business operation and trend, (b) the inability of Allou to make sound and well founded business decisions or to formulate realistic business models, plans or projections relating to its business and operations, and (c) the incurrence of substantial liabilities by Allou without any concomitant benefit.

131.    During the investigation of the fraud perpetrated by the Jacobs Family, the records reflecting legitimate purchases of inventory that were capable of verification were compared with the documentation relating to transactions among Allou and the Corporate Defendants.  While some of the transactions with the Corporate Defendants were properly documented, the vast majority of the transactions with the Corporate Defendants lacked any

indicia of regularity, such as shipping manifests, bills of lading or warehouse receiving reports. Inventory records of purchases from the Corporate Defendants were determined to be fictitious and part of a second, secret set of books maintained by the Jacobs.

132.    Through the use of entities controlled by the Jacobs, as well as entities controlled by the Jacobs' confederates, such as the Corporate Defendants, millions of dollars of Allou assets were diverted to third parties, including numerous friends, relatives, associates and acquaintances of the Jacobs as well as businesses, entities and organizations that had no legitimate business purpose.  For example, money was transferred to a furrier, a jeweler, a meat distributor, a fish merchant, schools, religious organizations, ostensible "charities" created by the Jacobs and other businesses that were not even remotely involved in the business of wholesale health and beauty aids, cosmetics and pharmaceuticals.

133.    The inflated accounts receivable and inventory results were included in various collateral reports provided to Allou's lenders, who utilized those sums to calculate the amounts that Allou could borrow from the lenders under its various loan agreements and arrangements.

134.    As a result of the Jacobs' fraudulent and artificial inflation of Allou's accounts receivable and inventory balances, Allou borrowed $200,000,000 from its lenders.

135.    The vast majority of the sums fraudulently borrowed from Allou's lenders was never utilized by Allou for its own benefit, but rather was either (a) directly stolen by, or transferred without consideration to, the Jacobs or their confederates, or (b) cycled through a series of sham transactions involving Allou and companies owned by the Jacobs or their confederates in order to project the illusion of Allou's financial prosperity and propagate the Jacobs' fraud while actively concealing Allou's deepening and irretrievable insolvency.

136.    Moreover, the Jacobs' mismanagement of Allou was intended to advance their own interests and those of their confederates, including the Greenfields, and was not intended to maintain Allou as an economically viable entity or to otherwise benefit Allou.

137.    By reason of the foregoing schemes, the Jacobs acted in a manner directly adverse to the interests of Allou.

138.    By reason of the foregoing, the Jacobs totally abandoned Allou's interest for those of the Jacobs and their confederates.

139.    It has been alleged that, in an attempt to "cover up" their fraud, the Jacobs, or persons acting at their bequest, set fire to Allou's Brooklyn warehouse, essentially burning it to the ground on September 25, 2002.  Because the fire marshals declared the fire arson, Allou's insurers refused to pay on Allou's $100 million fire loss claim.  Members of the Jacobs Family and associates thereafter tried to bribe a New York City Fire Marshal to issue a new report declaring that the fire was not caused by arson.  On August 8, 2003, arrest warrants were issued for the Jacobs and other individuals charging the Jacobs with numerous crimes including bank fraud, insurance fraud, arson and bribing a public official.  They were indicted in June 2004 and plead guilty to multiple counts on the indictment on November 22, 2005, and are awaiting sentencing.

140.    Prior to the arrests, but immediately after Allou's lenders first discovered the Jacobs' fraud, three (3) of Allou's lenders filed an involuntary chapter 11 against Allou.  Shortly thereafter, Allou's lenders demanded that the Jacobs make payment under the terms of a personal guarantee executed by them in connection with the Loan Agreement.  When the Jacobs would not honor the guarantee, and following additional suspicious transactions by the Jacobs including a confession of judgment in favor of a Swiss entity controlled by an indicted fugitive from justice, involuntary bankruptcies were instituted against the Jacobs individually on June 30, 2003, and, thereafter, the lenders made an emergency motion to have an interim trustee appointed over the Jacobs' estates.

141.    The documentary evidence produced at the nine (9) day interim trustee trial demonstrated a widespread pattern of deception by the Jacobs to mask their "looting" of Allou. In addition to diverting Allou funds to other companies and creating fictitious invoices to cover

their tracks, the Jacobs attempted to hide their fraud by signing documents under fictitious names or in their wives' names.

142.   At the conclusion of the trial, the Bankruptcy Court found that the Jacobs had engaged in transactions that appeared to be "money laundering" and that "certainly the record is more than sufficient for this Court to find that the Jacobs knowingly and intentionally have indeed engaged in a pattern where monies have been remitted into the Allou accounts only thereafter to be remitted to others or to be fictitiously related to another account so that the fact that they were received by an entity other than that which the records purported could not be readily made available."

### The Defendants' Participation in the Jacobs' Fraudulent Scheme

143.   As part of the fraud, the Jacobs and the Defendants used Allou money to transfer millions of dollars to create bogus sales and inventory purchases, for sham loans or otherwise.

144.   Those transfers caused Allou to inflate its reported inventory and sales and improperly depleted and wasted Allou's available assets.

145.   In addition to aiding and abetting the Jacobs in their scheme to inflate Allou's reported sales and inventory, M. Greenfield and H. Greenfield also directly participated in the Jacobs' scheme to loot allou of tens of millions of dollars in the Kent Rush Condominium scheme.

146.   The Corporate Defendants, I. Greenfield, H. Greenfield and M. Greenfield directly participated in the Jacobs scheme to defraud and loot Allou by receiving millions of dollars directly in connection with fictitious and fraudulent purchases of goods and by aiding and abetting the Jacobs in the scheme to divert millions of dollars in additional funds from Allou. The Defendants also participated in the Jacobs scheme by their role in the Kent Rush Condominium scheme, which is described below.

**The Defendants' Participation in the Jacobs' Scheme**
**To Fraudulently Inflate Allou's Inventory and Sales**

147.    The Corporate Defendants, at the express direction and under the control of M. Greenfield, H. Greenfield and I. Greenfield, actively assisted the Jacobs in defrauding Allou and its creditors by engaging in numerous "round trip" transactions with Allou and entities controlled by the Jacobs.  The express purpose and the end result of these transactions was to allow the Jacobs to create bogus sales and inventory purchases entered on the books of Allou.

148.    As a result of such fraudulent sales and inventory purchases, the Jacobs, aided and abetted by the Defendants' participation in the round trip transactions, reported fraudulently inflated sales and inventory to its lenders an in its public filings with the Securities and Exchange Commission.  The result of such fraudulent reports caused Allou to incur massive debt that Allou was unable to pay and gave the appearance to the public, including Allou's vendors, that Allou was a financially healthy and rapidly growing business.  In fact, the public appearance of a prosperous and financially healthy Allou, created by the Jacobs' and Defendants fraud, was an illusion.

149.    The Trustee's professionals have identified, to date, numerous transactions involving the Defendants, which also involved entities controlled by the Jacobs such as Impax, Capital Sales ("Capital"), Buy & Save Trading Corp. ("Buy & Save") and A&M Enterprises ("A&M").   The end result of the   transactions with Defendants was that approximately $20,306,990 in fictitious sales and $22,603,587 in fictitious inventory purchases were recorded on Allou's books and records.

150.    The Trustee continues to investigate the transactions among Allou and the Defendants and strongly believes there are additional fraudulent round trip transactions that were part and parcel of the Jacobs' fraudulent scheme.

*[Reminder of page intentionally left blank.]*

151.    The transactions creating fraudulent inventory and sales on Allou's books in which the Defendants acted as accomplices are set forth in the following table:

| Entity Code | Type | Amount | Date on Bk Stmt | Transaction on Allou Books |
|---|---|---|---|---|
| **Step 1** | | | | |
| TZ | wire in | 200,000.00 | 1/2/1997 | |
| ALLOU | 578842 | (200,000.00) | 1/3/1997 | **F (=fake inventory purchase)** |
| **Step 2** | | | | |
| TZ | debit memo | (400,000.00) | 1/6/1997 | |
| TZ | wire out | (200,000.00) | 1/8/1997 | |
| **Step 1** | | | | |
| ALLOU | 579284 | (1,040,000.00) | 5/6/1997 | F |
| IMPAX | wire in | 540,000.00 | 5/6/1997 | |
| IMPAX | wire in | 500,000.00 | 5/6/1997 | |
| **Step 2** | | | | |
| IMPAX | wire out | (1,040,000.00) | 5/7/1997 | |
| TZ | wire in | 1,040,000.00 | 5/8/1997 | |
| **Step 3** | | | | |
| TZ | wire out | (1,029,000.00) | 5/8/1997 | |
| ALLOU | W/T | 1,029,600.00 | 5/8/1997 | **SMN 2 (=bogus sale by "salesman no. 2)** |
| **Step 1** | | | | |
| ALLOU | 579280 | (1,360,462.47) | 5/5/1997 | F |
| IMPAX | wire in | 1,000,000.00 | 5/5/1997 | |
| IMPAX | wire in | 360,462.47 | 5/5/1997 | |
| **Step 2** | | | | |
| IMPAX | wire out | (1,360,000.00) | 5/6/1997 | |
| TZ | wire in | 1,360,000.00 | 5/6/1997 | |
| **Step 3** | | | | |
| TZ | 2991 | (1,346,400.00) | 5/9/1997 | |
| ALLOU | 2991 | 1,346,400.00 | 5/8/1997 | SMN 2 |
| **Step 1** | | | | |
| ALLOU | 579364 | (1,300,046.47) | 5/27/1997 | F |
| IMPAX | wire in | 1,000,000.00 | 5/27/1997 | |
| IMPAX | wire in | 300,046.47 | 5/27/1997 | |
| **Step 2** | | | | |
| IM | wire out | (1,300,462.42) | 5/28/1997 | |
| TZ | wire in | 1,300,462.42 | 5/28/1997 | |
| **Step 3** | | | | |
| TZ | 5005 | (696,857.84) | 5/30/1997 | |
| TZ | 5004 | (650,000.00) | 5/30/1997 | |
| ALLOU | 5005 | 696,857.84 | 5/30/1997 | SMN 2 |
| ALLOU | 5004 | 650,000.00 | 5/30/1997 | SMN 2 |

**Step 1**

| | | | | |
|---|---|---|---|---|
| ALLOU | 579291 | (417,926.66) | 5/7/1997 | **F** |
| BUYSAVE | check | (550,000.00) | 5/13/1997 | |
| CAP SALES | deposit | 417,926.66 | 5/7/1997 | |
| CAP SALES | deposit | 550,000.00 | 5/13/1997 | |

**Step 2**

| | | | | |
|---|---|---|---|---|
| CAP SALES | 1359 | (960,000.00) | 5/13/1997 | |
| TZ | deposit | 960,000.00 | 5/13/1997 | |

**Step 3**

| | | | | |
|---|---|---|---|---|
| TZ | 4996 | (653,476.72) | 5/13/1997 | |
| TZ | 4995 | (500,000.00) | 5/13/1997 | |
| ALLOU | 4996 | 653,476.72 | 5/13/1997 | **SMN 2** |
| ALLOU | 4995 | 500,000.00 | 5/13/1997 | **SMN 2** |

**Step 1**

| | | | | |
|---|---|---|---|---|
| ALLOU | 579349 | (640,000.00) | 5/21/1997 | **F** |
| CAP SALES | wire in | 640,000.00 | 5/21/1997 | |

**Step 2**

| | | | | |
|---|---|---|---|---|
| TZ | wire out | (633,600.00) | 5/23/1997 | |
| ALLOU | W/T | 633,600.00 | 5/23/1997 | **SMN 2** |

**Step 3**

| | | | | |
|---|---|---|---|---|
| CAP SALES | 1362 | (639,968.00) | 5/28/1997 | |
| TZ | deposit | 639,968.00 | 5/28/1997 | |

**Step 1**

| | | | | |
|---|---|---|---|---|
| TZ | 4994 | (950,400.00) | 5/9/1997 | |
| TZ | 4993 | (215,747.40) | 5/9/1997 | |
| ALLOU | 4994 | 950,400.00 | 5/9/1997 | **SMN 2** |
| ALLOU | 4993 | 215,747.40 | 5/9/1997 | **SMN 2** |

**Step 2**

| | | | | |
|---|---|---|---|---|
| ALL | 579303 | (1,165,000.00) | 5/13/1997 | **F** |

**Step 1**

| | | | | |
|---|---|---|---|---|
| TZ | deposit | 2,776,874.71 | 9/24/1997 | |

**Step 2**

| | | | | |
|---|---|---|---|---|
| TZ | transfer in | 2,749,582.91 | 9/29/1997 | |

**Step 3**

| | | | | |
|---|---|---|---|---|
| TZ | 3147 | (950,000.00) | 9/30/1997 | |
| TZ | 3148 | (925,000.00) | 9/30/1997 | |
| TZ | 3149 | (854,255.95) | 9/30/1997 | |
| ALLOU | 3147 | 950,000.00 | 9/29/1997 | **SMN 2** |
| ALLOU | 3148 | 925,000.00 | 9/29/1997 | **SMN 2** |
| ALLOU | 3149 | 854,255.95 | 9/29/1997 | **SMN 2** |

**Step 1**

| | | | | |
|---|---|---|---|---|
| TZ | credit memo | 2,631,800.16 | 11/26/1997 | |

**Step 2**

| | | | | |
|---|---|---|---|---|
| TZ | 2684 | (726,872.59) | 12/1/1997 | |
| TZ | 2685 | (1,111,200.00) | 12/1/1997 | |
| TZ | 2686 | (755,274.24) | 12/1/1997 | |
| ALLOU | 2686 | 755,274.24 | 11/28/1997 | **SMN 2** |
| ALLOU | 2684 | 726,872.59 | 11/28/1997 | **SMN 2** |
| | 2568 | | | **SMN 2** |
| ALLOU | (2685) | 555,600.00 | 11/28/1997 | |
| ALLOU | 2685 | 555,600.00 | 11/28/1997 | **SMN 2** |

**Step 3**

| | | | | |
|---|---|---|---|---|
| ALL | 580078 | (2,593,346.83) | 12/8/1997 | **F** |

**Step 1**

| | | | | |
|---|---|---|---|---|
| ALLOU | 580432 | (830,000.00) | 2/24/1998 | **F** |
| ALLOU | 580433 | (700,000.00) | 2/25/1998 | **F** |
| TZ | credit memo | 830,000.00 | 2/25/1998 | |
| TZ | credit memo | 700,000.00 | 2/26/1998 | |

**Step 2**

| | | | | |
|---|---|---|---|---|
| TZ | 2698 | (821,000.00) | 2/26/1998 | |
| TZ | 2701 | (709,000.00) | 3/2/1998 | |

**Step 1**

| | | | | |
|---|---|---|---|---|
| TZ | credit memo | 400,000.00 | 7/7/1998 | |
| ALLOU | 581270 | (400,000.00) | 7/7/1998 | **F** |

**Step 2**

| | | | | |
|---|---|---|---|---|
| TZ | 3577 | (400,000.00) | 7/7/1998 | |

**Step 3**

| | | | | |
|---|---|---|---|---|
| ALLOU | deposit | 469,310.71 | 7/8/1998 | **SMN 2** |

**Step 1**

| | | | | |
|---|---|---|---|---|
| TZ | transfer in | 500,000.00 | 1/19/1999 | |

**Step 2**

| | | | | |
|---|---|---|---|---|
| TZ | 18757 | (500,000.00) | 1/22/1999 | |
| ALLOU | 8757 | 500,000.00 | 1/20/1999 | **SMN 2** |

**Step 1**

| | | | | |
|---|---|---|---|---|
| TZ | transfer in | 500,000.00 | 1/28/1999 | |

**Step 2**

| | | | | |
|---|---|---|---|---|
| TZ | 3868 | (500,000.00) | 2/1/1999 | |
| ALLOU | 3868 | 500,000.00 | 1/29/1999 | **SMN 2** |

| | | | | |
|---|---|---|---|---|
| **Step 1** | | | | |
| TZ | credit memo | 2,000,000.00 | 4/1/1999 | |
| **Step 2** | | | | |
| TZ | 3940 | (1,000,000.00) | 4/1/1999 | |
| TZ | 3941 | (1,000,000.00) | 4/1/1999 | |
| ALLOU | misc | 900,000.00 | 3/31/1999 | **SMN 2** |

| | | | | |
|---|---|---|---|---|
| **Step 1** | | | | |
| ALLOU | 582483 | (1,055,000.00) | 4/6/1999 | **F** |
| ALLOU | 582506 | (945,000.00) | 4/6/1999 | **F** |
| TZ | credit memo | 527,500.00 | 4/6/1999 | |
| TZ | credit memo | 527,500.00 | 4/6/1999 | |
| TZ | credit memo | 945,000.00 | 4/6/1999 | |
| **Step 2** | | | | |
| TZ | debit memo | (2,100,000.00) | 4/13/1999 | |

| | | | | |
|---|---|---|---|---|
| **Step 1** | | | | |
| TZ | credit memo | 785,000.00 | 10/7/1999 | |
| TZ | credit memo | 1,019,233.94 | 10/6/1999 | |
| **Step 2** | | | | |
| TZ | debit memo | (400,000.00) | 10/8/1999 | |
| ALLOU | W/T | 200,000.00 | 10/8/1999 | **SMN 2** |
| ALLOU | W/T | 200,000.00 | 10/8/1999 | **SMN 2** |

| | | | | |
|---|---|---|---|---|
| **Step 1** | | | | |
| TZ | deposit | 370,538.70 | 10/12/1999 | |
| **Step 2** | | | | |
| TZ | debit memo | (385,000.00) | 10/12/1999 | |
| ALLOU | WT | 385,000.00 | 10/12/1999 | **L&E** |

| | | | | |
|---|---|---|---|---|
| **Step 1** | | | | |
| TZ | credit memo | 200,000.00 | 11/15/1999 | |
| ALLOU | 597729 | (200,000.00) | 11/15/1999 | **F** |
| **Step 2** | | | | |
| TZ | 4210 | (75,000.00) | 11/16/1999 | |
| TZ | 4209 | (125,000.00) | 11/16/1999 | |

**Step 1**

| | credit | | |
|---|---|---|---|
| TZ | memo | 50,000.00 | 12/23/1999 |
| ALLOU | 598009 | (50,000.00) | 12/23/1999 | **F** |

**Step 2**

| | | | |
|---|---|---|---|
| TZ | 5466 | (50,000.00) | 12/28/1999 |

**Step 1**

| | | | |
|---|---|---|---|
| TZ | deposit | 1,900,230.00 | 12/28/1999 |
| TZ | deposit | 1,107,442.00 | 12/29/1999 |
| ALLOU | 1512 | (900,100.00) | 12/29/1999 | **F** |
| ALLOU | 1510 | (1,000,130.00) | 12/30/1999 | **F** |
| ALLOU | 1514 | (1,107,442.00) | 12/30/1999 | **F** |

**Step 2**

| | transfer | | |
|---|---|---|---|
| TZ | out | (1,400,000.00) | 12/30/1999 |
| | transfer | | |
| TZ | out | (1,601,680.36) | 1/6/2000 |
| | credit | | |
| TZ | memo | 1,400,000.00 | 12/30/1999 |
| | credit | | |
| TZ | memo | 1,601,680.36 | 1/6/2000 |

**Step 3**

| | debit | | |
|---|---|---|---|
| TZ | memo | (1,400,000.00) | 12/31/1999 |
| | credit | | |
| TZ | memo | 1,100,000.00 | 1/5/2000 |
| | credit | | |
| TZ | memo | 400,000.00 | 1/12/2000 |
| | credit | | |
| TZ | memo | 400,000.00 | 2/2/2000 |
| | debit | | |
| TZ | memo | (500,000.00) | 1/19/2000 |
| | debit | | |
| TZ | memo | (3,000,000.00) | 2/4/2000 |

**Step 1**

| | | | |
|---|---|---|---|
| TZ | deposit | 1,701,008.00 | 12/29/1999 |
| TZ | deposit | 1,405,592.00 | 12/28/1999 |
| ALLOU | 1513 | (1,701,008.00) | 12/30/1999 | **F** |
| ALLOU | 1511 | (825,500.00) | 12/29/1999 | **F** |
| ALLOU | 1508 | (580,092.00) | 12/29/1999 | **F** |

**Step 2**

| | debit | | |
|---|---|---|---|
| TZ | memo | (2,000,000.00) | 12/31/1999 |
| | debit | | |
| TZ | memo | (1,100,000.00) | 1/5/2000 |

| | | | | |
|---|---|---|---|---|
| **Step 1** | | | | |
| ALLOU | WT | 250,000.00 | 6/7/2000 | **L&E** |
| TZ | debit memo | (250,000.00) | 6/7/2000 | |
| **Step 2** | | | | |
| ALLOU | 598986 | (250,000.00) | 6/12/2000 | **F** |
| TZ | credit memo | 250,000.00 | 6/12/2000 | |

| | | | | |
|---|---|---|---|---|
| **Step 1** | | | | |
| TZ | deposit | 933,900.00 | 9/11/2000 | |
| **Step 2** | | | | |
| TZ | debit memo | (1,000,000.00) | 9/25/2000 | |
| TZ | transfer in | 1,000,000.00 | 9/25/2000 | |
| **Step 3** | | | | |
| ALLOU | | | | **SMN 10 (bogus sale by "salesman no. 10"0** |
| | W/T | 881,610.00 | 9/25/2000 | |
| TZ | debit memo | (881,610.00) | 9/25/2000 | |

| | | | | |
|---|---|---|---|---|
| **Step 1** | | | | |
| TZ | credit memo | 100,000.00 | 1/4/2001 | |
| ALLOU | 600299 | (100,000.00) | 1/4/2001 | **F** |
| **Step 2** | | | | |
| TZ | debit memo | (125,000.00) | 1/5/2001 | |

| | | | | |
|---|---|---|---|---|
| **Step 1** | | | | |
| TZ | deposit | 661,266.26 | 10/11/2001 | |
| **Step 2** | | | | |
| TZ | wire out | (220,000.00) | 10/15/2001 | |
| TZ | wire in | 220,000.00 | 10/15/2001 | |
| **Step 3** | | | | |
| ALLOU | 5301 | 209,796.00 | 10/26/2001 | **SMN 10** |
| ALLOU | 5305 | 124,080.00 | 10/29/2001 | **SMN 10** |
| TZ | 5301 | (209,796.00) | 10/26/2001 | |
| TZ | 5305 | (124,080.00) | 10/29/2001 | |

| | | | | |
|---|---|---|---|---|
| **Step 1** | | | | |
| TZ | wire in | 452,166.67 | 12/20/2001 | |
| TZ | wire in | 452,166.67 | 12/20/2001 | |
| TZ | wire in | 452,166.67 | 12/20/2001 | |
| TZ | wire in | 452,166.67 | 12/20/2001 | |
| TZ | wire in | 452,166.67 | 12/20/2001 | |
| TZ | wire in | 452,166.65 | 12/20/2001 | |
| ALLOU | 602011 | (2,713,000.00) | 12/20/2001 | **F** |
| **Step 2** | | | | |
| TZ | wire out | (2,740,313.90) | 12/24/2001 | |

| | | | | |
|---|---|---|---|---|
| **Step 1** | | | | |
| TZ | wire in | 406,864.80 | 12/24/2001 | |
| TZ | wire in | 406,864.80 | 12/24/2001 | |
| TZ | wire in | 406,864.80 | 12/24/2001 | |
| ALLOU | 602029 | (1,220,594.40) | 12/24/2001 | **F** |
| **Step 2** | | | | |
| TZ | wire out | (1,640,683.68) | 12/26/2001 | |
| | | | | |
| **Step 1** | | | | |
| TZ | wire in | 1,640,683.68 | 3/12/2002 | |
| **Step 2** | | | | |
| TZ | wire out | (1,650,000.00) | 3/14/2002 | |
| ALLOU | W/T | 1,650,000.00 | 3/14/2002 | **SMN 2** |
| | | | | |
| **Step 1** | | | | |
| TZ | wire in | 1,400,000.00 | 3/14/2002 | |
| **Step 2** | | | | |
| TZ | wire out | (1,385,000.00) | 3/15/2002 | |
| ALLOU | W/T | 1,385,000.00 | 3/15/2002 | **SMN 2** |
| | | | | |
| **Step 1** | | | | |
| TZ | wire in | 1,340,313.90 | 3/19/2002 | |
| **Step 2** | | | | |
| TZ | wire out | (898,594.42) | 3/20/2002 | |
| ALLOU | W/T | 898,594.42 | 3/20/2002 | **SMN 2** |
| TZ | wire out | (175,000.00) | 3/20/2002 | |
| TZ | wire out | (300,000.00) | 3/22/2002 | |
| | | | | |
| **Step 1** | | | | |
| TZ | wire out | (300,000.00) | 3/22/2002 | |
| TZ | wire in | 300,000.00 | 3/22/2002 | |
| **Step 2** | | | | |
| TZ | 5749 | (271,480.00) | 3/21/2002 | |
| ALLOU | 5749 | 271,480.00 | 3/21/2002 | **SMN 2** |
| | | | | |
| **Step 1** | | | | |
| **Step 2** | | | | |
| TZ | wire out | (300,000.00) | 3/22/2002 | |
| TZ | wire out | (100,000.00) | 3/25/2002 | |
| TZ | wire out | (300,000.00) | 3/25/2002 | |
| TZ | credit memo | 300,000.00 | 3/25/2002 | |
| TZ | wire in | 300,000.00 | 3/22/2002 | |
| TZ | wire in | 100,000.00 | 3/25/2002 | |
| **Step 3** | | | | |
| TZ | 5754 | (232,750.00) | 3/25/2002 | |
| TZ | 5753 | (233,070.00) | 3/26/2002 | |
| TZ | 5072 | (290,000.00) | 3/26/2002 | |
| TEREZA | 5072 | 290,000.00 | 3/25/2002 | **SMN 2** |
| TEREZA | 5754 | 232,750.00 | 3/25/2002 | **SMN 2** |
| TEREZA | 5753 | 233,070.00 | 3/26/2002 | **SMN 2** |

| | | | | |
|---|---|---|---|---|
| **Step 1** | | | | |
| TZ | credit memo | 299,000.00 | 4/23/2002 | |
| TZ | credit memo | 299,000.00 | 4/23/2002 | |
| ALLOU | 602780 | (598,000.00) | 4/24/2002 | **F** |
| **Step 2** | | | | |
| TEREZA | 5762 | 303,000.00 | 4/29/2002 | **SMN 2** |
| TEREZA | 5761 | 295,000.00 | 4/29/2002 | **SMN 2** |
| TZ | 5761 | (295,000.00) | 4/30/2002 | |
| TZ | 5762 | (303,000.00) | 4/30/2002 | |
| **Step 1** | | | | |
| TZ | credit memo | 200,000.00 | 5/16/2002 | |
| ALLOU | 602946 | (200,000.00) | 5/16/2002 | **F** |
| **Step 2** | | | | |
| TZ | wire out | (200,000.00) | 5/24/2002 | |
| ALLOU | WT | 200,000.00 | 5/24/2002 | **L&E** |
| **Step 1** | | | | |
| TZ | credit memo | 200,000.00 | 6/12/2002 | |
| ALLOU | 603138 | (200,000.00) | 6/12/2002 | **F** |
| **Step 2** | | | | |
| TZ | wire out | (200,000.00) | 6/20/2002 | |
| ALLOU | W/T | 200,000.00 | 6/20/2002 | **SMN 2** |
| **Step 1** | | | | |
| ALLOU | 603575 | (500,000.00) | 9/11/2002 | **F** |
| TZ | wire in | 500,000.00 | 9/11/2002 | |
| **Step 2** | | | | |
| ALLOU | 5784 | 500,000.00 | 9/17/2002 | **SMN 2** |
| TZ | 5784 | (500,000.00) | 9/20/2002 | |
| **Step 1** | | | | |
| *TZ* | wire in | 5,000.00 | 11/14/2002 | |
| ALLOU | 603943 | (5,000.00) | 11/14/2002 | **F** |
| **Step 2** | | | | |
| ALLOU | WT | 5,000.00 | 11/21/2002 | L&E |
| TZ | WT | (5,000.00) | 11/21/2002 | |
| **Step 1** | | | | |
| TZ | wire in | 426,250.00 | 11/27/2002 | |
| TZ | wire in | 426,250.00 | 11/27/2002 | |
| TZ | wire in | 426,250.00 | 11/27/2002 | |
| TZ | wire in | 426,250.00 | 11/27/2002 | |
| ALLOU | 604018 | (1,705,000.00) | 11/27/2002 | **F** |
| **Step 2** | | | | |
| TZ | 5808 | (862,208.43) | 12/2/2002 | |

| | | | | |
|---|---|---|---|---|
| TZ | 5809 | (862,208.42) | 12/2/2002 | |
| **TBD** | | | | |
| ALLOU | WT | 1,620,440.00 | 9/7/1999 | **L&E** |
| ALLOU | WT | 943,410.00 | 9/9/1999 | **L&E** |
| ALLOU | W/T | 855,400.00 | 9/7/1999 | **SMN 2** |
| ALLOU | W/T | 1,840,455.00 | 9/8/1999 | **SMN 2** |
| ALLOU | W/T | 657,765.00 | 9/8/1999 | **SMN 2** |
| TZ | debit memo | (1,620,440.00) | 9/7/1999 | |
| TZ | debit memo | (500,000.00) | 9/7/1999 | |
| TZ | debit memo | (2,358,803.50) | 9/7/1999 | |
| TZ | debit memo | (1,077,679.00) | 9/8/1999 | |
| TZ | debit memo | (500,000.00) | 9/9/1999 | |

152.    Included in the transactions listed above, are transactions by which the Jacobs and the Defendants laundered Allou money through Tereza for the purpose of funneling Allou's funds to Satmar community organizations.  Through the unlawful use of Allou funds in this manner, the Defendants and the Jacobs hoped to enhance their position in the Satmar community and influence the power struggle for succession to the Grand Rebbe, Moshe Teitelbaum.

153.    Upon information and belief, on November 15, 1999, one or more of the Jacobs caused Allou to transfer $200,000 to Tereza.  This amount was booked by Allou as a purchase of inventory, but Allou received nothing for this fraudulent transfer.

154.    On the next day, Tereza paid $75,000 to B'nai Yerushalayim and $125,000 to Yeshiva Torah V'yirah, both religious and/or educational institutions in the Satmar community.

155.    On December 23, 1999, one or more of the Jacobs caused Allou to transfer $50,000 to Tereza.  This transaction was booked by Allou as a purchase of inventory, but Allou received nothing for this fraudulent transfer.

156.    On December 28, 1999, Tereza transferred $50,000 to Yeshiva Torah V'Yirah.

**The Defendants' Participation in the Kent Rush Realty Scam**

      **I.**      **Overview of the Kent Rush Condominium Scheme**

      157.    The Trustee, by his retained professionals, discovered that millions of dollars of the funds diverted from Allou by the Jacobs were used by the Jacobs, in December 1998, to purchase the block of property bordered by Kent Avenue, Rush Street, Wythe Avenue and Morton Street in Brooklyn, New York (the "Kent Avenue Property").  The purchase was made by Kent Rush Realty Corp. ("Kent Rush Realty"), an entity controlled by the Jacobs and whose President was Herman Jacobs.  All of the Kent Avenue Property was purchased from an entity called Propco Management, Inc. ("Propco") at a closing on December 29, 1998 (the "Kent Rush Closing").  At the time of the acquisition, Kent Rush Realty executed a $5 million mortgage to K.E.R.U. Realty Corp. ("K.E.R.U."), and a $2 million mortgage to 2165 K-R Realty Corp. (:2165 K-R").

      158.    Herman Jacobs was the President of Kent Rush Realty.

      159.    Both 2165 K-R and K.E.R.U. were formed on December 28, 1998 by Leon Traube, Esq. ("Traube"), the attorney for the Jacobs and Kent Rush Realty.  At all relevant times, Traube served as attorney for the Jacobs, Kent Rush Realty, 2165 K-R and K.E.R.U.

      160.    On December 28, 1998, the day before the Kent Rush Closing, Traube, the Jacobs attorney, also formed:  Kent Rush Realty, K-R Residence Corp. ("K-R Residence") and DJR Construction LLC ("DJR").

      161.    M. Greenfield was a principal and/or owner of both 2165 K-R and K.E.R.U. and signed numerous documents related to the Kent Avenue Condominiums and Kent Avenue Property as an authorized representative of 2165 K-R and K.E.R.U.  Upon information and belief, M. Greenfield acted as a front for the real interests of the Jacobs' family.

      162.    The funds for the purchase of the Kent Avenue Property did not come from either 2165 K-R or K.E.R.U. As detailed below, all funds for the purchase of the Kent Avenue Property came from Allou through entities controlled or owned by the Jacobs.

163.    Between 1998 and 2000, DJR, a Jacobs' controlled construction general contractor, a principal of which is Ari Jacobs, demolished the abandoned structures on the Kent Rush Property using money illegally diverted from Allou.  Thereafter, DJR built six buildings on the Kent Avenue Property containing over 180 condominium units (the "Kent Avenue Condominiums").  In addition to looting Allou of the funds necessary to purchase the Kent Avenue Property and the demolition of existing structures, the Jacobs continued to use Allou funds for the construction of the Kent Avenue Condominiums.  Millions of dollars of Allou funds were fraudulently diverted from Allou through certain Jacobs controlled entities as detailed herein, to DJR with the knowledge of Ari and DJR's other principals.  All of the units were then transferred by Kent Rush Realty, with the exception of two units which are still owned in the name of Kent Rush Realty.  Nine units were transferred by Kent Rush Realty to K-R Residence, which also received fraudulent transfers of funds from Allou.

164.    On or about September 22, 2000, the Jacobs obtained construction financing for the Kent Rush Condominiums in the amount of $31 million.  As part of the closing of the construction financing, the $2 million mortgage held in the name of 2165 K-R was spread to cover a separate parcel located in Brooklyn, New York, owned by Bedford Wall Realty Corp., another Jacobs-controlled entity (the "Bedford Wall Property").  At the same time, the $2 million mortgage was released from the Kent Avenue Property for no apparent consideration other than the spreader mortgage on the Jacobs property.

165.    In July 2003, three (3) days after involuntary bankruptcy proceedings were commenced against the Jacobs and a few weeks before the Jacobs and Ari were arrested for, among other things, fraudulently diverting funds from Allou, the $2 million mortgage was assigned to Tereza LLC and the Bedford Wall Property was transferred to 724 Bedford LLC.  Both the assignment of the spreader mortgage from 2165 K-R to Tereza and the transfer deed for the Bedford Wall Property from Bedford Wall Realty Corp. to 724 Bedford were purportedly

recorded in the county clerk's office on July 4, 2004, a legal holiday on which, upon information and belief, such office was closed.

166.    Tereza LLC was formed on May 23, 2003 and its registered agent for service of process, as listed with the New York State Department of State, is Herbert Greenfield, a member of M. Greenfield's family and a principal of defendants HIL and Tereza.   Herbert Greenfield also signed the Assignment of Mortgage from 2165 K-R to Tereza.   Upon information and belief, the assignment of the spreader mortgage from 2165 K-R to Tereza had no legitimate purpose and was part of a scheme concocted by the Jacobs and the defendants herein to put the Bedford Wall Property beyond the reach of the Trustee.   Upon information and belief, both 724 Bedford and Tereza are directly or indirectly owned and/or controlled by the Jacobs Family, and these transfers were made in order to attempt to place these assets out of the reach of the Trustee.

167.    The Kent Avenue Condominiums were transferred to, or occupied by, for the most part, members of the Satmar community, including, upon information and belief, several relatives of the Jacobs and relatives of individuals who are believed to have assisted the Jacobs in the fraud, or who were associates of the Jacobs within the Satmar community.   Accordingly, the Kent Rush Condominium scheme assisted the Jacobs and the Greenfields in their efforts to influence the succession battle between Zalman Teitelbaum and Aaron Teitelbaum.

168.    The development of the Kent Avenue Condominiums greatly enhanced the stature of the Jacobs Family and the Greenfields' within the Satmar community, while also allowing the Jacobs, Ari, the Defendants and their accomplices to reap a substantial financial benefit from their fraud.

169.    Through his investigation to date, the Trustee has determined that no less than $14,959,000 of Allou funds were used to purchase the Kent Avenue Property and construct the Kent Avenue Condominiums.

170.    The Defendants were active and willing participants in the Jacobs scheme to loot Allou of what was ultimately hundreds of millions of dollars, including the funds diverted to the Kent Rush Condominiums.

171.    The Kent Avenue Condominium project was one of the vehicles used by the Jacobs and Ari to divert money from Allou and launder the proceeds of the fraud.

172.    In perpetrating the fraud, the Jacobs were acting solely in their own interests and in the interests of their accomplices, including the Defendants, and members of the Jacobs Family, and totally adverse to the interests of Allou.

173.    The funds were initially transferred from Allou to entities owned and/or controlled by the Jacobs and Ari, including, among others, entities known as SE-Roebuck Ltd. ("SE-Roebuck"), Arrow Distributing Corp. ("Arrow"), Buy & Save, Ever Ready First Aid Medical Supply Corp. d/b/a A&M, T.J. Associates ("TJ Associates"), Capital; Impax, and Kimberly Trading & Holding, Ltd. ("Kimberly") (collectively, the "Controlled Entities").  In addition, as detailed below, millions of dollars were funneled to the Defendants herein by the use of fraudulent and fictitious inventory purchases.  Some of the funds received by the Defendants were rerouted to, among other entities, Buy & Save, Capital and Impax.

174.    The fraudulent transfers to the Controlled Entities and the Defendants were concealed by the Jacobs through the use of fraudulent entries on the books of Allou to make it appear as if Allou was paying for merchandise when, in fact, these entries were fictitious and not supported by any consideration to Allou.

175.    A separate set of records showing that millions of dollars of Allou funds were being fraudulently diverted through the Controlled Entities to pay for the Kent Avenue Property and some of the construction costs of the Kent Avenue Condominiums was located in a computer maintained by Herman Jacobs at Allou's offices in Brentwood, New York.

176.    At the time the Jacobs' fraudulent activities at Allou were first coming to light in the spring of 2003, a Jacobs Family associate was caught attempting to surreptitiously remove

this computer by the outside management firm which was then investigating certain discrepancies in Allou's books and records.

177.    Defendants knew of the fraudulent transfers and conspired with the Jacobs to fraudulently divert monies from Allou to acquire the Kent Rush Property and construct the Kent Rush Condominiums.

178.    In addition to the Controlled Entities referred to above, a corporation known as Eurofactors International Inc. ("Eurofactors") was used to fraudulently divert money from Allou and launder the monies stolen by the Jacobs from Allou.  Mosi Kraus (a/k/a Moses Krausz, a/k/a Moses Kraus), who, upon information and belief, is a Eurofactors principal, was indicted on February 18, 1999 on charges of wire fraud and money laundering.  Two warrants were issued for his arrest on October 14, 1999 and September 14, 2000 by the United States District Court for the Southern District of Ohio, apparently in connection with matters not relating to Allou.  Upon information and belief, Mr. Kraus was never apprehended and is reportedly residing in Switzerland.

179.    Upon information and belief, Morris Greenfield, an accomplice of the Jacobs, or members of his family, are principals of or otherwise related with Eurofactors and also the same persons who executed documents on behalf of defendants K.E.R.U. and 2165 K-R as set forth herein.

II.    **The Fraudulent Acquisition of the Kent
       Avenue Property With Allou Funds**

180.    On December 16, 1998, Allou issued six wire transfers totaling $5,570,000 that were sent to the account of Kimberly, one of the Controlled Entities, at Bai Banca Della Svizzera Italiano, Bleicherweg, 37, Ch-8023, Zurich, Switzerland.

181.    Upon information and belief, between December 16, 1998 and December 29, 1998, at least $4,999,965 of the funds transferred by Allou to Kimberly were transferred to a Eurofactors account in Switzerland.

182.    In addition, between October 13, 1999 and July 3, 2000 there were twelve wire transfers from Allou to Eurofactors in the total amount of $8,393,828.43.  These transfers were recorded on the records of Allou as payments to Olbex International Trading Co. ("Olbex"), Ltd. for certain invoices, all of which were fictitious.  The fact that these "payments" were made to Eurofactors further demonstrates that Eurofactors was being used by the Jacobs and Ari to launder monies being fraudulently transferred out of Allou and directed to other ventures such as the Kent Rush Property.

183.    Olbex was an entity with which HIL and Tereza purportedly did more than $110 million of business during the period January 1997 and November 2003.

184.    On December 21, 1998 and December 25, 1998, Allou issued wire transfers totaling $1,450,000 that were sent to an account of Impax, another Controlled Entity, at European American Bank, account no. 3049939.

185.    On December 28, 1998, Allou issued a wire transfer in the amount of $1,500,000, that was sent to an account of Arrow, another Controlled Entity, at Republic National Bank, account no. 0030162637.

186.    Allou received no consideration for the transfers to Kimberly, Impax, Eurofactors and Arrow described above.

187.    Upon information and belief, on December 29, 1998, a total of approximately $7.5 million was transferred from Eurofactors, Arrow and Impax to the attorney trust account of Traube (the "Kent Rush Transfers"), as follows:  $4,999,965 from Eurofactors; $1,500,000 from Arrow; and $1,000,000 from Impax.

188.    Upon information and belief, on or about December 29, 1998, a closing took place at which the then owner of the Kent Avenue Property, Propco conveyed title to the property to Kent Rush Realty.

189.    Upon information and belief, at the closing, all, or substantially all, of the Kent Rush Transfers were disbursed from Traube's attorney trust account to purchase the Kent Avenue Property and pay the closing costs necessary to consummate the sale.

190.    The transaction was structured to make it appear that Kent Rush Realty borrowed $7 million from K.E.R.U. and 2165 K-R with the purported loans documented as follows: (a) a $5 million first mortgage in favor of K.E.R.U. on the Kent Avenue Property (the "K.E.R.U. Mortgage") and (b) a $2 million second mortgage in favor of 2165 K-R on the Kent Avenue Property (the "K-R Mortgage") (as referred to hereinafter the term the "Kent Rush Transfers" shall include the K-R Mortgage).

191.    Upon information and belief, neither K.E.R.U. nor 2165 K-R advanced any monies to pay for the acquisition and related closing expenses.

192.    Upon information and belief, the K.E.R.U. Mortgage and the K-R Mortgage, both of which were executed by Herman as President of Kent Rush Realty, were fraudulent and designed to conceal the fact that the source of the funds was Allou.

### III.    The Further Diversion of Allou Funds to Develop the Kent Avenue Property

193.    After the purchase of the Kent Avenue Property, the Jacobs and Ari continued to fraudulently divert funds from Allou through certain of the Controlled Entities, which funds were used to construct the Kent Avenue Condominiums.

194.    Upon information and belief, pursuant to a construction contract between DJR and Kent Rush Realty, DJR agreed to serve as the general contractor for the construction of the Kent Avenue Condominiums.

195.    Shortly after the closing of the Kent Avenue Property, on or about January 19, 1999, $160,000 was transferred from Traube's attorney trust account to DJR to open DJR's bank account at HSBC Bank (the "Opening DJR Transfer") and used to pay expenses related to the development of the Kent Avenue Condominiums.  Upon information and belief, these funds

were obtained from monies fraudulently diverted by the Jacobs and Ari from Allou to one or more of the Controlled Entities.

196.    In addition, between February 25, 1999 and September 13, 2000, DJR received no less than $2,780,000 (together with the Opening DJR Transfer, the "Initial DJR Transfers") from the Controlled Entities as follows:

| Date | Amount | Transferor |
|---|---|---|
| 2/25/1999 | $     25,000 | Arrow |
| 3/11/1999 | 50,000 | Arrow |
| 4/23/1999 | 50,000 | Arrow |
| 5/20/1999 | 50,000 | Arrow |
| 6/29/1999 | 25,000 | Arrow |
| 7/8/1999 | 50,000 | Arrow |
| 8/2/1999 | 25,000 | Presently Unknown |
| 8/16/1999 | 100,000 | Buy & Save |
| 9/10/1999 | 50,000 | Arrow |
| 11/18/1999 | 35,000 | Presently Unknown |
| 11/29/1999 | 35,000 | Presently Unknown |
| 1/27/2000 | 50,000 | Impax |
| 2/15/2000 | 100,000 | Buy & Save |
| 2/25/2000 | 100,000 | Buy & Save |
| 3/13/2000 | 175,000 | SE-Roebuck. |
| 3/21/2000 | 100,000 | Presently Unknown |
| 4/10/2000 | 30,000 | Capital Sales |
| 4/12/2000 | 50,000 | Capital Sales |
| 4/14/2000 | 20,000 | SE-Roebuck |
| 4/19/2000 | 35,000 | Capital Sales |
| 5/19/2000 | 50,000 | Impax |
| 5/26/2000 | 150,000 | SE-Roebuck |
| 6/12/2000 | 200,000 | A&M |
| 6/20/2000 | 100,000 | A&M |
| 6/28/2000 | 200,000 | SE-Roebuck |
| 7/10/2000 | 250,000 | SE-Roebuck |
| 8/17/2000 | 200,000 | Impax |
| 8/30/2000 | 75,000 | Impax |
| 9/13/2000 | 400,000 | SE-Roebuck |
| Total | $2,780,000 | |

197.    Upon information and belief, the Initial DJR Transfers were made with monies fraudulently diverted by the Jacobs and Ari from Allou to the Controlled Entities.  Allou received no consideration for the Initial DJR Transfers.

### IV.    The Construction Loan and Further Fraudulent
### Transfers from Allou to DJR and Kent Rush Realty

198.    On September 22, 2000, a closing took place at which Defendant Kent Rush Realty entered into a construction loan agreement under the terms of which the Community Preservation Corp. ("CPC") agreed to "refinance" Kent Rush's purported acquisition costs and to advance monies over a period of time to construct the Kent Avenue Condominiums for a total loan in the amount of $31 million (the "Construction Loan").

199.    Upon information and belief, at the September 22, 2000 closing of the Construction Loan, the existing $5 million K.E.R.U. Mortgage was assigned to CPC by K.E.R.U. by assignment dated September 21, 2000 (the "K.E.R.U. Assignment"), and then consolidated with the $26 million construction loan mortgage for a total consolidated mortgage lien in the amount of $31 million.   In addition, as more fully discussed below, the K-R Mortgage was released from the Kent Rush Property.  The K.E.R.U. Assignment and the release of the K-R Mortgage were executed by M. Greenfield, an accomplice of the Jacobs.

200.    Under the terms of the Construction Loan, Kent Rush was required to provide $4,298,745 of equity toward the construction costs.  Upon information and belief, this equity was paid from funds fraudulently diverted by the Jacobs and Ari from Allou.

201.    Subsequent to the closing of the Construction Loan, DJR continued to receive transfers of Allou funds from the Controlled Entities in the total amount of no less than $3,435,000 (the "Subsequent DJR Transfers" and together with the Initial DJR Transfers, the "DJR Transfers") as follows:

| Date | Amount | Transferor |
|------|--------|------------|
| 9/25/2000 | $  450,000 | SE-Roebuck |
| 9/27/2000 | 150,000 | SE-Roebuck |
| 10/11/2000 | 300,000 | SE-Roebuck |
| 11/21/2000 | 150,000 | SE-Roebuck |
| 12/19/2000 | 250,000 | SE-Roebuck |
| 1/9/2001 | 400,000 | SE-Roebuck |
| 2/5/2001 | 350,000 | A&M |
| 2/7/2001 | 99,000 | A&M |

| Date | Amount | Transferor |
|---|---|---|
| 2/7/2001 | 66,000 | A&M |
| 6/8/2001 | 25,000 | TJ Associates |
| 7/26/2001 | 30,000 | TJ Associates |
| 12/31/2001 | 10,000 | TJ Associates |
| 1/17/2002 | 22,000 | TJ Associates |
| 1/18/2002 | 20,000 | TJ Associates |
| 3/13/2002 | 50,000 | TJ Associates |
| 3/15/2002 | 100,000 | Impax |
| 3/18/2002 | 10,000 | Impax |
| 4/18/2002 | 105,000 | Impax |
| 4/19/2002 | 60,000 | Impax |
| 4/23/2002 | 40,000 | Impax |
| 7/15/2002 | 60,000 | Impax |
| 7/16/2002 | 11,000 | Impax |
| 7/19/2002 | 10,000 | TJ Associates |
| 7/22/2002 | 50,000 | Impax |
| 7/30/2002 | 20,000 | TJ Associates |
| 8/1/2002 | 25,000 | TJ Associates |
| 8/2/2002 | 5,000 | TJ Associates |
| 8/5/2002 | 28,000 | TJ Associates |
| 8/7/2002 | 15,000 | Impax |
| 8/9/2002 | 45,000 | Impax |
| 8/15/2002 | 50,000 | TJ Associates |
| 8/23/2002 | 40,000 | Impax |
| 8/29/2002 | 15,000 | Impax |
| 8/30/2002 | 10,000 | Impax |
| 9/3/2002 | 5,000 | Impax |
| 9/10/2002 | 50,000 | Impax |
| 9/12/2002 | 25,000 | TJ Associates |
| 9/24/2002 | 10,000 | TJ Associates |
| 10/15/2002 | 25,000 | Impax |
| 10/22/2002 | 20,000 | Impax |
| 10/23/2002 | 5,000 | Impax |
| 10/25/2002 | 2,000 | Impax |
| 10/28/2002 | 20,000 | Impax |
| 11/5/2002 | 30,000 | Impax |
| 11/12/2002 | 25,000 | Impax |
| 11/21/2002 | 20,000 | TJ Associates |
| 11/29/2002 | 2,000 | Impax |
| 12/2/2002 | 25,000 | TJ Associates |
| 12/10/2002 | 35,000 | Impax |
| 12/19/2002 | 25,000 | Impax |
| 1/3/2003 | 2,500 | Impax |
| 2/3/2003 | 21,000 | Impax |
| 2/7/2003 | 16,500 | Impax |
| Total | $3,435,000 | |

202.    Upon information and belief, the Subsequent DJR Transfers were made with monies fraudulently diverted by the Jacobs and Ari from Allou to the Controlled Entities and were used to pay expenses related to the development of the Kent Avenue Condominiums. Allou received no consideration for the Subsequent DJR Transfers.

203.    On or about April 5, 2001, A&M, one of the Controlled Entities, transferred $650,000 to Kent Rush Realty (the "2001 Kent Rush Transfer").  Upon information and belief, the 2001 Kent Rush Transfer was made with monies fraudulently diverted by the Jacobs and Ari from Allou to A&M and, along with the DJR Transfers, was used to pay for expenses related to the development of the Kent Avenue Condominiums.  (As referred to hereinafter, the term "Kent Rush Transfers" includes the 2001 Kent Rush Transfer.)

**V.    The Fraudulent Transfers to K-R Residence**

204.    In addition to the above-mentioned fraudulent transfers to Kent Rush Realty and DJR, K-R Residence received no less than $434,000 from the Controlled Entities in the following transfers (the "K-R Residence Cash Transfers"):

| Date | Amount | Transferor |
|------|--------|------------|
| 2/13/1999 | $12,000 | Arrow |
| 2/11/1999 | 2,000 | Arrow |
| 3/03/1999 | 160,000 | Arrow |
| 4/30/1999 | 50,000 | Presently Unknown |
| 7/1/1999 | 210,000 | TJ Associates |
| Total | $434,000 | |

205.    Upon information and belief, the K-R Residence Cash Transfers were made with monies fraudulently diverted by the Jacobs and Ari from Allou to the Controlled Entities and were used to pay for expenses related to the development of the Kent Avenue Condominiums. Allou received no consideration for the K-R Residence Cash Transfers.

## VI.    The Declarations and Condominium Offering Plans

206.    The Kent Avenue Condominiums consist of three (3) separate condominiums known as (a) The 525-535 Park Plaza Condominium, (b) The 570-576 Park Plaza Condominium and (c) The 564-580 Park Plaza Condominium.

207.    Declarations dated October 31, 2001 were filed by Kent Rush Realty with respect to each of the three (3) condominiums.  Herman Jacobs was the declarant on behalf of Kent Rush Realty in each of the Declarations.

208.    In addition, three (3) separate Condominium Offering Plans were filed with respect to the three (3) condominiums comprising the Kent Avenue Condominiums, the first on January 18, 2001 and the remaining two on April 9, 2001.  K-R Residence was designated therein as the sponsor and selling agent for the sale of the individual units.  The total purchase price for all of the units offered for sale pursuant to the Condominium Offering Plans was approximately $60,000,000.

209.    The Construction Loan was repaid, in part, from the proceeds of the sales of the condominium units until the Construction Loan was fully satisfied on or about November 1, 2002.  Upon information and belief, at that time, approximately 130 out of the total of 182 units had been sold, leaving approximately 52 units still owned by Kent Rush Realty, with an average selling price of approximately $285,000.

210.    Upon information and belief, millions of dollars in excess of the amounts necessary to satisfy the Construction Loan were received by Kent Rush Realty from the sales of the condominium units as the owner of the Kent Avenue Condominium.  Millions of dollars were also paid to K-R Residence from the sales proceeds, purportedly as sponsor and selling agent.

## VII.    The Bedford Wall Transfers

211.    At the time of the closing of the Construction Loan in September 2000, Bedford Wall, Kent Rush Realty and 2165 K-R executed a spreader agreement dated September 22, 2000 (the "Spreader Agreement"), but purportedly executed on September 21, 2000, pursuant

to which the lien of the K-R Mortgage was spread to cover a parcel of realty owned by Bedford Wall located on Bedford Avenue, Brooklyn, New York (the "Bedford Wall Property"). The $2 million K-R Mortgage was released from the Kent Rush Property pursuant to a partial release of mortgage dated September 21, 2000, executed by 2165 K-R and Kent Rush Realty (the "Partial Release").

212.    The result of the foregoing transactions was to substitute the Bedford Wall Property for the Kent Rush Property in the K-R Mortgage. The K-R Mortgage was, and still is, subject to Allou's interest therein as the actual source of the monies that funded the K-R Mortgage.

213.    Pursuant to deed dated July 3, 2003 (the "Bedford Deed"), Bedford Wall conveyed the Bedford Wall Property to 724 Bedford. At the same time, the K-R Mortgage was transferred to Tereza LLC by assignment of mortgage (the "Bedford Assignment") dated July 3, 2003, which assignment was executed by H. Greenfield, a member of M. Greenfield's family and a principal in the Corporate Defendants. According to the public record maintained by the Office of the City Register of the City of New York, both the Bedford Deed and the Bedford Assignment were not recorded until one year after they were purportedly executed.

214.    Ari executed the Spreader Agreement and the Bedford Deed on behalf of Bedford Wall, and Herman executed the Spreader Agreement on behalf of Kent Rush Realty. The Partial Release was purportedly executed on behalf of 2165 K-R by M. Greenfield who, as stated previously, was an accomplice of the Jacobs and Ari.

215.    Significantly, the Bedford Deed and the Bedford Assignment were executed only a few weeks before Victor, Herman, Jacob and Ari were arrested for crimes relating to, among other things, their fraudulent diversion of funds of Allou, and only three (3) days after involuntary petitions in bankruptcy were filed against the Jacobs.

216.    Upon information and belief, Bedford Wall, 724 Bedford and Tereza (collectively with Kent Rush Realty and 2165 K-R, the "Bedford Wall Defendants") are directly or indirectly

owned and/or controlled by the Jacobs and Ari, and the assignment of the K-R Mortgage and the transfer of the Bedford Wall Property were done to further conceal the fact that the K-R Mortgage had been funded by monies fraudulently diverted from Allou.

217.    In addition, upon information and belief, the aforementioned transfers were made with the intent of placing the K-R Mortgage and the Bedford Wall Property (collectively, the "Bedford Wall Transfers") beyond the reach of Allou, and its creditors, and in order to hinder and delay Allou, and its creditors from recovering the indebtedness of the Jacobs and Ari to Allou as a result of their fraudulent activities, including their liability for the fraudulent diversion of Allou's funds as described herein.

218.    M. Greenfield and H. Greenfield participated in the transactions involving the Spreader Agreement on the Bedford Wall Property as accomplices of the Jacobs Family in furtherance of their scheme to defraud Allou and its creditors.  Such participation aided and abetted the Victor, Herman and Jacob Jacobs in their fraud and their breach of fiduciary duties to Allou.

### Defendants' Transactions With Olbex International

219.    During the time that the Corporate Defendants were being paid over $32 million by Allou for fraudulent inventory transactions, approximately January 1997 through March 2003, the Corporate Defendants were paying to Olbex more than $90 million.

220.    Upon information and belief, Olbex was an entity controlled and/or dominated by the Jacobs.

221.    Upon information and belief, Olbex was a vehicle actively utilized by the Jacobs for laundering money, including money funneled through the Corporate Defendants by the Jacobs.

222.    Upon information and belief, the transactions between HIL and Olbex, and Tereza and Olbex had no purpose other than to divert funds from Allou and launder the funds for the benefit of the Jacobs and their cohorts, including the Defendants.

### Defendants' Transactions With Other Controlled Entities

223.    Upon information and belief, Capital is an entity owned and controlled by members of the Jacobs family.   Millions of dollars from Allou passed through Capital in furtherance of the Jacobs family's scheme to loot Allou.

224.    During the period that Capital was utilized by the Jacobs family to loot Allou, Tereza paid to Capital at least $1,190,000.

225.    Upon information and belief, Buy & Save is an entity owned and controlled by members of the Jacobs family.   Millions of dollars from Allou passed through Buy & Save in furtherance of the Jacobs family's scheme to loot Allou.

226.    For example, upon information and belief, on May 13, 1997, Tereza deposited into its bank account a check from Buy & Save in the amount of $550,000.  On the same date, Tereza issued a check to Capital in the amount of $550,000.

227.    On May 21, 1997, Allou wired $640,000 to Tereza.   The Jacobs caused this transaction to be booked fraudulently by Allou as a purchase of inventory, but Allou received nothing for the payment. On the same date, Tereza paid to Capital $640,000.   Thereafter, on May 23, 1997, Tereza wire transferred to Allou $633,600.00, which the Jacobs caused Allou to fraudulently book as sales revenue on sales made by the fictitious "salesman number 2".   As a result of this round-trip transaction, Allou's inventory was fraudulently inflated by $640,000 and its revenues were fraudulently inflated by $633,600.00.  Upon information and belief neither the wire from Allou to Tereza nor the payment by Tereza to Capital was for legitimate commercial purposes.   Upon information and belief said payments had no legitimate commercial purpose and were part and parcel of the Jacob family's scheme to loot Allou.

228.    Impax is an entity owned and controlled by members of the Jacobs family.   Tens of millions of dollars from Allou passed through Impax in furtherance of the Jacobs family's scheme to loot Allou.

229.    On May 5, 1997, Tereza received two wire transfers of funds from Allou in the total amount of $1,360,462.47.    On the same date, Tereza issued a check to Impax for $1,360,462.47.    Upon information and belief said payments had no legitimate commercial purpose and were part and parcel of the Jacob family's scheme to loot Allou.

230.    On May 6, 1997, Tereza received a wire transfer of funds from Allou in the amount of $1,360,000.    On the same date, Tereza wired to Impax $1,360,000.    Upon information and belief said payments had no legitimate commercial purpose and were part and parcel of the Jacob family's scheme to loot Allou.

231.    Also on May 6, 1997, Tereza received two wire transfers from Allou totaling $1,040,000.  On the same date, Tereza issued a check to Impax in the amount of $1,040,000.  Upon information and belief said payments had no legitimate commercial purpose and were part and parcel of the Jacob family's scheme to loot Allou.

232.    On May 7, 1997, Tereza wired $1,040,000 to Impax.   On May 8, 1997, Allou wired to Tereza $1,040,000.   Upon information and belief said payments had no legitimate commercial purpose and were part and parcel of the Jacob family's scheme to loot Allou.

233.    On May 27, 1997, Tereza received two wire transfers from Allou in the total amount of $1,300,046.47.  On the same date, Tereza issued a check to Impax in the amount of $1,300,046.47.   Upon information and belief said payments had no legitimate commercial purpose and were part and parcel of the Jacob family's scheme to loot Allou.

234.    On May 28, 1997, Tereza received a wire transfer from Allou in the amount of $1,300,462.42.    On the same date, Tereza wire transferred to Allou the amount of $1,300,462.42.    Upon information and belief said payments had no legitimate commercial purpose and were part and parcel of the Jacob family's scheme to loot Allou.

235.    Allou, Tereza and the Controlled Entities engaged in numerous additional transactions of this nature, reflecting transfers in from Jacobs-controlled entities or Allou and simultaneous or nearly simultaneous transfers out by Tereza, during the period from May 1997

through March 2003.  None of the transactions had legitimate commercial purposes.  All of the transactions were part and parcel of the Jacobs family's scheme to loot Allou and the Defendants' direct participation in that scheme.

### Damages Suffered by Allou as a Result of the Jacobs' Fraud

236.    As a direct result of the fraud perpetrated by the Jacobs family, in which the Defendants were direct participants, Allou was damaged in an amount not less than $200 million, the amount which Allou owed to its asset-based lenders, plus additional losses attributed to the theft of money directly from Allou.

### Direct Transfers to Defendants

237.    Allou made at least One Hundred Thirty-One (131) separate transfers totaling no less than $21,238,492.69 directly to defendant HIL between April 9, 1997 and April 9, 2003 (the "HIL Transfers").

238.    At least Twenty (20) of the HIL Transfers totaling $943,348.64 were made within one year of the Petition Date (the "HIL One Year Transfers").

239.    In the case of each of the HIL Transfers, by prior agreement among HIL and the Jacobs, HIL did not actually ship any products to Allou and Allou did not receive any products from HIL.  Consequently, Allou did not receive any consideration for the HIL Transfers or the HIL One Year Transfers.

240.    The HIL Transfers confirmed to date, are set forth below:

| CHECK/WIRE NO. | CHECK CLEAR/ WIRE DATE | AMOUNT |
|---|---|---|
| 12879 | 2/12/1997 | $11,655.61 |
| 12967 | 2/21/1997 | $7,925.40 |
| 13292 | 5/5/1997 | $7,956.00 |
| 13390 | 5/30/1997 | $70,500.00 |
| 13469 | 6/25/1997 | $5,271.60 |
| 13490 | 6/26/1997 | $10,760.00 |
| 13712 | 8/14/1997 | $3,708.00 |
| 13811 | 9/4/1997 | $2,880.00 |
| 13832 | 9/5/1997 | $4,528.80 |
| 14022 | 10/10/1997 | $1,723.68 |

| | | |
|---|---|---|
| 14412 | 12/10/1997 | $7,285.60 |
| 14735 | 2/11/1998 | $7,560.00 |
| 14781 | 2/19/1998 | $33,854.80 |
| 580432 | 2/24/1998 | $830,000.00 |
| 580433 | 2/25/1998 | $700,000.00 |
| 14961 | 3/16/1998 | $10,603.44 |
| 15437 | 6/5/1998 | $4,261.95 |
| 15552 | 7/1/1998 | $103,420.80 |
| 15579 | 7/8/1998 | $74,187.90 |
| 16236 | 10/22/1998 | $140,047.60 |
| 16427 | 11/24/1998 | $82,555.37 |
| 16434 | 11/27/1998 | $38,753.44 |
| 16470 | 12/4/1998 | $239,978.96 |
| 16505 | 12/11/1998 | $174,003.40 |
| 16527 | 12/15/1998 | $38,838.80 |
| 16558 | 12/15/1998 | $26,087.60 |
| 16590 | 12/22/1998 | $121,863.49 |
| 16616 | 1/6/1999 | $65,024.96 |
| 16681 | 1/12/1999 | $5,948.80 |
| 16648 | 1/20/1999 | $29,400.00 |
| 16816 | 2/1/1999 | $22,191.19 |
| 16857 | 2/12/1999 | $143,074.95 |
| 16923 | 2/25/1999 | $131,515.42 |
| 16948 | 2/26/1999 | $22,644.16 |
| 16973 | 3/10/1999 | $177,770.00 |
| 17010 | 3/15/1999 | $161,428.96 |
| 17042 | 3/18/1999 | $21,546.42 |
| 17073 | 3/24/1999 | $12,681.90 |
| 17147 | 4/16/1999 | $11,966.37 |
| 17188 | 4/27/1999 | $90,742.90 |
| 17272 | 5/5/1999 | $120,835.40 |
| 17366 | 6/1/1999 | $56,625.26 |
| 1453 | 6/2/1999 | $107,559.76 |
| 17478 | 6/21/1999 | $47,175.00 |
| 17574 | 7/7/1999 | $18,000.00 |
| 17643 | 7/28/1999 | $178,458.00 |
| 17832 | 9/1/1999 | $595,813.86 |
| 17922 | 9/20/1999 | $331,801.68 |
| 17993 | 10/14/1999 | $370,538.70 |
| 18006 | 10/14/1999 | $220,911.60 |
| 17965 | 10/14/1999 | $6,879.60 |
| 18082 | 10/22/1999 | $76,519.08 |
| 18126 | 10/26/1999 | $27,005.55 |
| 597627 | 10/28/1999 | $103,194.00 |
| 18091 | 10/29/1999 | $378,241.50 |
| 18163 | 11/2/1999 | $79,295.04 |
| 18188 | 11/9/1999 | $48,157.20 |
| 1499 | 11/23/1999 | $327,654.12 |

| | | |
|---|---|---|
| 101498 | 11/23/1999 | $51,532.14 |
| 18275 | 12/15/1999 | $307,639.84 |
| 18422 | 12/20/1999 | $34,979.92 |
| 18466 | 12/27/1999 | $245,033.52 |
| 18486 | 12/29/1999 | $70,038.00 |
| 1511[1] | 12/29/1999 | $825,500.00 |
| 1508[1] | 12/29/1999 | $580,092.00 |
| 1513[1] | 12/30/1999 | $1,701,008.00 |
| 18505 | 1/7/2000 | $75,940.20 |
| 18511 | 1/7/2000 | $53,075.16 |
| 18520 | 1/14/2000 | $191,568.84 |
| 18558 | 1/18/2000 | $40,320.00 |
| 1515[1] | 1/18/2000 | $66,070.00 |
| 18496 | 1/27/2000 | $54,296.90 |
| 18642 | 2/1/2000 | $95,855.76 |
| 18726 | 2/22/2000 | $24,550.38 |
| 18751 | 2/25/2000 | $65,338.56 |
| 18822 | 3/15/2000 | $142,809.58 |
| 18865 | 3/27/2000 | $25,194.00 |
| 18890 | 3/29/2000 | $178,664.88 |
| 18982 | 5/2/2000 | $31,635.00 |
| 19175 | 6/14/2000 | $273,641.00 |
| 19179 | 6/19/2000 | $157,528.80 |
| 19220 | 6/26/2000 | $528,828.91 |
| 19244 | 7/5/2000 | $13,851.00 |
| 19268 | 7/5/2000 | $10,080.00 |
| 19237 | 7/11/2000 | $284,027.40 |
| 19319 | 7/18/2000 | $197,964.00 |
| 19419 | 8/24/2000 | $431,049.60 |
| 19444 | 8/25/2000 | $447,566.40 |
| 19511 | 8/30/2000 | $555,807.96 |
| 19532 | 9/7/2000 | $73,427.40 |
| 19521 | 9/7/2000 | $9,766.80 |
| 19539 | 9/13/2000 | $10,773.00 |
| 19554 | 9/21/2000 | $104,845.88 |
| 19560 | 9/28/2000 | $344,345.76 |
| 20042 | 12/20/2000 | $1,104.03 |
| 1632 | 1/3/2001 | $129,547.20 |
| 1630 | 1/4/2001 | $63,120.00 |
| 1631 | 1/11/2001 | $182,964.00 |
| 20396 | 3/21/2001 | $14,227.20 |
| 20577 | 5/14/2001 | $13,708.80 |
| 20772 | 6/11/2001 | $116,781.21 |
| 1691 | 7/31/2001 | $61,916.40 |
| 21097 | 8/7/2001 | $88,544.82 |
| 21673 | 12/11/2001 | $38,374.52 |
| 21685 | 12/11/2001 | $34,780.20 |
| 602011 | 12/20/2001 | $2,713,000.00 |

| | | |
|---|---|---|
| 602029 | 12/24/2001 | $1,220,594.40 |
| 21769 | 1/9/2002 | $38,404.56 |
| 21893 | 2/11/2002 | $42,789.00 |
| 21916 | 2/15/2002 | $11,107.50 |
| 21923 | 2/26/2002 | $18,720.00 |
| 22268 | 5/8/2002 | $116,378.00 |
| 22249 | 5/14/2002 | $20,064.00 |
| 22289 | 5/14/2002 | $17,048.00 |
| 22357 | 5/29/2002 | $30,595.20 |
| 22358 | 5/29/2002 | $570.00 |
| 22395 | 6/12/2002 | $83,396.00 |
| 22362 | 6/27/2002 | $52,489.00 |
| 22460 | 8/1/2002 | $42,760.00 |
| 22533 | 8/1/2002 | $18,432.00 |
| 22561 | 8/16/2002 | $162,119.16 |
| 22608 | 8/22/2002 | $25,107.00 |
| 22857 | 9/24/2002 | $103,573.44 |
| 22835 | 9/24/2002 | $28,024.00 |
| 1932 | 9/26/2002 | $79,805.20 |
| 91931 | 9/26/2002 | $9,836.64 |
| 23110 | 12/2/2002 | $5,040.00 |
| 23232 | 12/30/2002 | $31,876.00 |
| 23366 | 1/27/2003 | $46,284.00 |
| 23476 | 3/13/2003 | $58,731.00 |
| 23444 | 3/13/2003 | $11,220.00 |

Note 1 - Although the four (4) checks affecting these transfers are made payable to "Hills Merchandising," each check was deposited into a HIL Associates bank account at The Merchants Bank of New York.

241.    Allou made at least Twenty-Nine (29) separate transfers totaling no less than $11,250,753.73 directly to defendant Tereza between April 9, 1997 and April 9, 2003 (the "Tereza Transfers").

242.    At least Eighteen (18) of the Tereza Transfers totaling $4,513,224.45 were made within one year of the Petition Date (the "Tereza One Year Transfers").

243.    Allou did not receive any fair consideration for the Tereza Transfers or the Tereza One Year Transfers.

244.    The Tereza Transfers confirmed to date, are set forth below:

| CHECK/ WIRE NO. | CHECK CLEAR/ WIRE DATE | AMOUNT |
|---|---|---|
| 578842 | 1/3/1997 | $200,000.00 |
| 581270 | 7/7/1998 | $400,000.00 |
| 582483 | 4/6/1999 | $1,055,000.00 |
| 582506 | 4/6/1999 | $945,000.00 |
| 596428 | 10/6/1999 | $785,000.00 |
| 597729 | 11/15/1999 | $200,000.00 |
| 598009 | 12/23/1999 | $50,000.00 |
| 1512 | 12/29/1999 | $900,100.00 |
| 1514 | 12/30/1999 | $1,107,442.00 |
| 1510 | 12/30/1999 | $1,000,130.00 |
| 1556 | 6/7/2000 | $94,857.28 |
| 602780 | 4/24/2002 | $598,000.00 |
| 602946 | 5/16/2002 | $200,000.00 |
| 603138 | 6/12/2002 | $200,000.00 |
| 138003 | 7/24/2002 | $32,026.50 |
| 137849 | 7/25/2002 | $30,049.70 |
| 137997 | 8/1/2002 | $41,000.00 |
| 24997 | 8/16/2002 | $307,984.20 |
| 603575 | 9/11/2002 | $500,000.00 |
| 25088 | 9/25/2002 | $287,826.50 |
| 603943 | 11/14/2002 | $5,000.00 |
| 138433 | 11/25/2002 | $47,892.00 |
| 604018 | 11/27/2002 | $1,705,000.00 |
| 604021 | 11/27/2002 | $36,835.20 |
| 25295 | 12/19/2002 | $98,320.25 |
| 138675 | 12/27/2002 | $96,469.50 |
| 138710 | 1/3/2003 | $48,372.00 |
| 138793 | 1/14/2003 | $22,551.00 |
| 138781 | 1/16/2003 | $140,743.68 |
| 138850 | 2/5/2003 | $115,153.92 |

245.    Upon information and belief, within ninety (90) days before the Filing Date, Allou made at least Three (3) separate transfers totaling no less than $278,448.60 directly to Tereza (the "Tereza Preferential Transfers").

246.    A listing of the Tereza Preferential Transfers confirmed to date, is set forth below:

| CHECK/ WIRE NO. | CHECK CLEAR/ WIRE DATE | AMOUNT |
|---|---|---|
| 138793 | 1/14/2003 | $22,551.00 |
| 138781 | 1/16/2003 | $140,743.68 |
| 138850 | 2/5/2003 | $115,153.92 |

247.    Allou made at least One (1) separate transfer totaling no less than $600,000.00 directly to defendant Morgren between April 9, 1997 and April 9, 2003 (the "Morgren Transfer").

248.    Allou did not receive any fair consideration for the Morgren Transfer.

249.    The Morgren Transfer confirmed to date, is set forth below:

| CHECK/WIRE NO. | CHECK CLEAR/ WIRE DATE | AMOUNT |
|---|---|---|
| 581268 | 7/7/1998 | $600,000.00 |

### The Existence of Unsecured Creditors of Allou

250.    At all times relevant to the allegations in this complaint, from no earlier than January 1997 through and including March 31, 2003, Allou did substantial business with legitimate vendors who sold products to Allou on unsecured terms.   Accordingly, at all times relevant to the allegations in this complaint, from no earlier than January 1997 through and including March 31, 2003, Allou had one or more actual unsecured creditors.

### First Claim for Relief Against All Defendants
### (Aiding and Abetting Breach of Fiduciary Duty)
### (incorporating all previous allegations)

251.    The Defendants knew of the violations and the conduct of the Jacobs Family with respect to Allou and the fraudulent scheme perpetrated by the Jacobs as aided by the Defendants.

252.    The Defendants, acting in concert with the Jacobs Family, rendered substantial assistance in the achievement of the waste, mismanagement and breach of fiduciary duties by the Jacobs Family by virtue of the Defendants' participation in the fraudulent scheme.

253.    As a result of the foregoing, Allou suffered losses totaling at least $200,000,000, leaving them with liabilities substantially in excess of their assets and with a multitude of claimants seeking compensatory and other damages all of which culminated in the Debtors' financial ruin and ultimate bankruptcy.

254.    By reason of the foregoing, the Defendants are liable to the Trustee in the sum of at least $200,000,000 for aiding and abetting the waste and mismanagement of Allou's assets by the Jacobs Family and the breach of their fiduciary duties.

### Second Claim for Relief Against All Defendants
### (Aiding and Abetting Fraud)
### (incorporating all previous allegations)

255.    The Jacobs Family perpetuated a scheme to defraud Allou and all creditors of Allou through manipulation of Allou's reported accounts receivable and inventory and through money laundering.

256.    The Defendants' actions in respect of the Kent Rush Condominiums project and the transactions with Controlled Entities were patently irregular and were not the type of transactions that would be undertaken as part of the regular and legitimate commercial activities.

257.    By agreeing to participate in the Kent Rush Condominium scheme and bogus transactions with the Controlled Entities, the Defendants knew or should have known that the Jacobs Family were engaged in a fraud designed to cause injury to Allou and all creditors of Allou.

258.    The Defendants substantially assisted the Jacobs Family in the commission of the fraud by agreeing to participate in the Kent Rush Condominium scheme and the bogus transactions with the Controlled Entities.

259.    Allou and all creditors of Allou were injured by the massive fraud aided, abetted and participated in by the Defendants.

260.    As a result, the Trustee is entitled to a judgment for no less than $200,000,000, including without limitation, compensatory, consequential, exemplary, punitive, expectation, and incidental damages, plus interest, arising from the Defendants' active participation in the intentional torts and fraud committed by the Jacobs Family against Allou and the creditors of Allou.

### Third Claim for Relief Against All Defendants
### (Fraud)
### (incorporating all previous allegations)

261.    The Corporate Defendants accepted the Transfers, and M. Greenfield, H. Greenfield and I. Greenfield caused the Corporate Defendants to accept the Transfers, with the understanding they were laundered and/or would be laundered at the Jacobs Family direction.

262.    The Corporate Defendants participated in, and M. Greenfield, H. Greenfield and I. Greenfield caused the Corporate Defendants to participate in, the round trip transactions with the Controlled Entities with the understanding they were laundered and/or would be laundered at the Jacobs Family direction.

263.    The Defendants knew or should have known that their agreement to launder the round trip transactions with the Controlled Entities and to receive laundered Transfers would facilitate the Jacobs Family fraud upon Allou and creditors of Allou causing substantial injury to those parties.

264.    M. Greenfield and H. Greenfield participated in the Kent Rush condominium scam with the understanding that they were facilitating the Jacobs Family's fraud on Allou and its creditors causing substantial injury to those parties.

265.    Allou and all creditors were actually injured as a consequence of the Defendants' conduct.

266.    As a result, the Trustee is entitled to a judgment for no less than $200,000,000, including without limitation, compensatory, consequential, exemplary, punitive, expectation, and incidental damages, plus interest, arising from the Defendants' participation in the fraud perpetrated against Allou and its creditors.

### Fourth Claim For Relief
### (incorporating all previous allegations)

267.    The H.I.L. Transfers were made in furtherance of the fraud and with the actual intent to hinder, delay or defraud creditors.

268.    As a result of the Jacobs Family's fraud at Allou, the Trustee is entitled to judgment (a) avoiding the to defendant H.I.L. Transfers pursuant to New York State Debtor & Creditor Law §276 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the H.I.L. Transfers set aside, (c) may recover from H.I.L. an amount as yet undetermined but in no event less than $17,615,822.69 plus appropriate interest thereon and may recover attorneys' fees pursuant to New York Debtor and Creditor Law §276-a.

### Fifth Claim For Relief
**(incorporating all previous allegations)**

269.    Upon information and belief, at the time of the H.I.L. Transfers, Allou was insolvent or was rendered insolvent by the H.I.L. Transfers.

270.    The H.I.L. Transfers constituted a fraudulent conveyance in violation of New York Debtor and Creditor Law §273.

271.    By reason of the foregoing, under Bankruptcy Code §544(b), plaintiff is entitled to a judgment (a) avoiding the H.I.L. Transfers pursuant to New York Debtor and Creditor Law §273 and 11 U.S.C. §§550(a) and 551, (b) may have the H.I.L. Transfers set aside, and (c) may recover from H.I.L. an amount as yet undetermined but in no event less than $17,615,822.69 plus appropriate interest thereon.

### Sixth Claim For Relief
**(incorporating all previous allegations)**

272.    Upon information and belief, at the time of the H.I.L. Transfers, Allou was engaged or about to engage in a business or transaction for which the property remaining in its possession after the conveyance was unreasonably small capital.

273.    The H.I.L. Transfers constituted a fraudulent conveyance in violation of New York Debtor and Creditor Law §274.

274.    By reason of the foregoing, under Bankruptcy Code §544(b), plaintiff is entitled to a judgment (a) avoiding the H.I.L. Transfers pursuant to New York Debtor and Creditor Law §274 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the H.I.L. Transfers set aside,

and (c) may recover from H.I.L. an amount as yet undetermined but in no event less than $17,615,822.69 plus appropriate interest thereon.

### Seventh Claim For Relief
**(incorporating all previous allegations)**

275.    Upon information and belief, at the time of the H.I.L. Transfers, Allou had incurred, was intending to incur or believed that it would incur debts beyond its ability to pay them as they matured.

276.    The H.I.L. Transfers constituted a fraudulent conveyance in violation of New York Debtor and Creditor Law §275.

277.    By reason of the foregoing, under Bankruptcy Code §544(b), plaintiff is entitled to a judgment (a) avoiding the H.I.L. Transfers pursuant to New York Debtor and Creditor Law §275 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the H.I.L. Transfers set aside, and (c) may recover from H.I.L. an amount as yet undetermined but in no event less than $17,615,822.69, plus appropriate interest thereon.

### Eighth Claim For Relief
**(incorporating all previous allegations)**

278.    The H.I.L. Transfers were an impermissible transfer of Allou's funds, a result of which H.I.L. was an ultimate beneficiary of such transfers under circumstances in which it would be unjustly enriched if H.I.L. were to retain such proceeds since Allou did not receive reasonable equivalent value for such transfers.

279.    As a result of the fraud described herein, H.I.L. has been unjustly enriched and may not in equity and good conscience retain the H.I.L. Transfers.

280.    By reason of the foregoing, H.I.L. is liable for unjust enrichment to the Trustee in an amount as yet undetermined but in no event less than $17,615,822.69 plus appropriate punitive damages and interest.

### Ninth Claim For Relief
**(incorporating all previous allegations)**

281.    Allou received less than reasonably equivalent value in exchange for the H.I.L. One Year Transfers.

282.    Upon information and belief, Allou (a) was insolvent on the dates that the H.I.L. One Year Transfers were made or became insolvent as a result of the H.I.L. One Year Transfers; (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Allou was unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts that would be beyond Allou's ability to pay as they matured.

283.    By reason of the foregoing, the H.I.L. One Year Transfers constitute fraudulent conveyances under 11 U.S.C. §548(a).

284.    By reason of the foregoing, the Trustee may avoid the H.I.L. One Year Transfers and may have the H.I.L. One Year Transfers set aside.

285.    By reason of the foregoing, the Trustee is entitled to a judgment (a) avoiding the H.I.L. One Year Transfers pursuant to Bankruptcy Code §548(a)(1)(B); and (b) setting aside the H.I.L. One Year Transfers.

286.    H.I.L. is the initial or immediate transferee of the H.I.L. One Year Transfers within the meaning of 11 U.S.C. §550(a) and, therefore, the Trustee may recover from H.I.L. an amount as yet undetermined, but which in no event is less than the sum of $943,348.64 together with interest thereupon.

### Tenth Claim For Relief
**(incorporating all previous allegations)**

287.    The H.I.L. One Year Transfers were made with the actual intent to hinder, delay, or defraud Allou's creditors.

288.    By reason of the foregoing, the Trustee is entitled to a judgment (a) avoiding the H.I.L. One Year Transfers pursuant to Bankruptcy Code §548; and (b) setting aside the H.I.L. One Year Transfers.

289.    H.I.L. is the initial or immediate transferee of the H.I.L. One Year Transfers within the meaning of 11 U.S.C. §550(a) and, therefore, the Trustee may recover from H.I.L. an amount as yet undetermined, but in no event less than the sum of $943,348.64, together with interest thereupon.

### Eleventh Claim For Relief
### (incorporating all previous allegations)

290.    The Hills Merch. Transfers were made in furtherance of the fraud and with the actual intent to hinder, delay or defraud creditors.

291.    As a result of the Jacobs Family's fraud at Allou, the Trustee is entitled to judgment (a) avoiding the Hills Merch. Transfers pursuant to New York State Debtor & Creditor Law §276 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the Hills Merch. Transfers set aside, (c) may recover from Hills Merch. an amount as yet undetermined but in no event less than $3,712,670.00 plus appropriate interest thereon and may recover attorneys' fees pursuant to New York Debtor and Creditor Law §276-a.

### Twelfth Claim For Relief
### (incorporating all previous allegations)

292.    Upon information and belief, at the time of the Hills Merch. Transfers, Allou was insolvent or was rendered insolvent by the Hills Merch. Transfers.

293.    The Hills Merch. Transfers constituted a fraudulent conveyance in violation of New York Debtor and Creditor Law §273.

294.    By reason of the foregoing, under Bankruptcy Code §544(b), plaintiff is entitled to a judgment (a) avoiding the Hills Merch. Transfers pursuant to New York Debtor and Creditor Law §273 and 11 U.S.C. §§550(a) and 551, (b) may have the Hills Merch. Transfers set aside,

and (c) may recover from Hills Merch. an amount as yet undetermined but in no event less than $3,712,670.00 plus appropriate interest thereon.

### Thirteenth Claim For Relief
**(incorporating all previous allegations)**

295.    Upon information and belief, at the time of the Hills Merch. Transfers, Allou was engaged or about to engage in a business or transaction for which the property remaining in its possession after the conveyance was unreasonably small capital.

296.    The Hills Merch. Transfers constituted a fraudulent conveyance in violation of New York Debtor and Creditor Law §274.

297.    By reason of the foregoing, under Bankruptcy Code §544(b), plaintiff is entitled to a judgment (a) avoiding the Hills Merch. Transfers pursuant to New York Debtor and Creditor Law §274 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the Hills Merch. Transfers set aside, and (c) may recover from Hills Merch. an amount as yet undetermined but in no event less than $3,712,670.00 plus appropriate interest thereon.

### Fourteenth Claim For Relief
**(incorporating all previous allegations)**

298.    Upon information and belief, at the time of the Hills Merch. Transfers, Allou had incurred, was intending to incur or believed that it would incur debts beyond its ability to pay them as they matured.

299.    The Hills Merch. Transfers constituted a fraudulent conveyance in violation of New York Debtor and Creditor Law §275.

300.    By reason of the foregoing, under Bankruptcy Code §544(b), plaintiff is entitled to a judgment (a) avoiding the Hills Merch. Transfers pursuant to New York Debtor and Creditor Law §275 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the Hills Merch. Transfers set aside, and (c) may recover from Hills Merch. an amount as yet undetermined but in no event less than $3,712,670.00, plus appropriate interest thereon.

### Fifteenth Claim For Relief
### (incorporating all previous allegations)

301.    The Hills Merch. Transfers were an impermissible transfer of Allou's funds, a result of which Hills Merch. was an ultimate beneficiary of the such transfers under circumstances in which it would be unjustly enriched if Hills Merch. were to retain such proceeds since Allou did not receive reasonable equivalent value for such transfers.

302.    As a result of the fraud described herein, Hills Merch. has been unjustly enriched and may not in equity and good conscience retain the Hills Merch. Transfers.

303.    By reason of the foregoing, Hills Merch. is liable for unjust enrichment to the Trustee in an amount as yet undetermined but in no event less than $3,712,670.00 plus appropriate punitive damages and interest.

### Sixteenth Claim For Relief
### (incorporating all previous allegations)

304.    The Tereza Transfers were made in furtherance of the fraud and with the actual intent to hinder, delay or defraud creditors.

305.    As a result of the Jacobs Family's fraud at Allou, the Trustee is entitled to judgment (a) avoiding the Tereza Transfers pursuant to New York State Debtor & Creditor Law §276 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the Tereza Transfers set aside, (c) may recover from Tereza an amount as yet undetermined but in no event less than $11,250,753.73 plus appropriate interest thereon and may recover attorneys' fees pursuant to New York Debtor and Creditor Law §276-a.

### Seventeenth Claim For Relief
### (incorporating all previous allegations)

306.    Upon information and belief, at the time of the Tereza Transfers, Allou was insolvent or was rendered insolvent by the Tereza Transfers.

307.    The Tereza Transfers constituted a fraudulent conveyance in violation of New York Debtor and Creditor Law §273.

308.    By reason of the foregoing, under Bankruptcy Code §544(b), plaintiff is entitled to a judgment (a) avoiding the Tereza Transfers pursuant to New York Debtor and Creditor Law §273 and 11 U.S.C. §§550(a) and 551, (b) may have the Tereza Transfers set aside, and (c) may recover from Tereza an amount as yet undetermined but in no event less than $11,250,753.73 plus appropriate interest thereon.

### Eighteenth Claim For Relief
### (incorporating all previous allegations)

309.    Upon information and belief, at the time of the Tereza Transfers, Allou was engaged or about to engage in a business or transaction for which the property remaining in its possession after the conveyance was unreasonably small capital.

310.    The Tereza Transfers constituted a fraudulent conveyance in violation of New York Debtor and Creditor Law §274.

311.    By reason of the foregoing, under Bankruptcy Code §544(b), plaintiff is entitled to a judgment (a) avoiding the Tereza Transfers pursuant to New York Debtor and Creditor Law §274 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the Tereza Transfers set aside, and (c) may recover from Tereza an amount as yet undetermined but in no event less than $11,250,753.73 plus appropriate interest thereon.

### Nineteenth Claim For Relief
### (incorporating all previous allegations)

312.    Upon information and belief, at the time of the Tereza Transfers, Allou had incurred, was intending to incur or believed that it would incur debts beyond its ability to pay them as they matured.

313.    The Tereza Transfers constituted a fraudulent conveyance in violation of New York Debtor and Creditor Law §275.

314.    By reason of the foregoing, under Bankruptcy Code §544(b), plaintiff is entitled to a judgment (a) avoiding the Tereza Transfers pursuant to New York Debtor and Creditor Law

§275 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the Tereza Transfers set aside, and (c) may recover from Tereza an amount as yet undetermined but in no event less than $11,250,753.73, plus appropriate interest thereon.

## Twentieth Claim For Relief
### (incorporating all previous allegations)

315.    The Tereza Transfers were an impermissible transfer of Allou's funds, a result of which Tereza was an ultimate beneficiary of the such transfers under circumstances in which it would be unjustly enriched if Tereza were to retain such proceeds since Allou did not receive reasonable equivalent value for such transfers.

316.    As a result of the fraud described herein, Tereza has been unjustly enriched and may not in equity and good conscience retain the Tereza Transfers.

317.    By reason of the foregoing, Tereza is liable for unjust enrichment to the Trustee in an amount as yet undetermined but in no event less than $11,250,753.73 plus appropriate punitive damages and interest.

## Twenty-First Claim For Relief
### (incorporating all previous allegations)

318.    Allou received less than reasonably equivalent value in exchange for the Tereza One Year Transfers.

319.    Upon information and belief, Allou (a) was insolvent on the dates that the Tereza One Year Transfers were made or became insolvent as a result of the Tereza One Year Transfers; (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Allou was unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts that would be beyond Allou's ability to pay as they matured.

320.    By reason of the foregoing, the Tereza One Year Transfers constitute fraudulent conveyances under 11 U.S.C. §548(a).

321.    By reason of the foregoing, the Trustee may avoid the Tereza One Year Transfers and may have the Tereza One Year Transfers set aside.

322.    By reason of the foregoing, the Trustee is entitled to a judgment (a) avoiding the Tereza One Year Transfers pursuant to Bankruptcy Code §548(a)(1)(B); and (b) setting aside the Tereza One Year Transfers.

323.    Tereza is the initial or immediate transferee of the Tereza One Year Transfers within the meaning of 11 U.S.C. §550(a) and, therefore, the Trustee may recover from Tereza an amount as yet undetermined, but which in no event is less than the sum of $4,513,224.45 together with interest thereupon.

### Twenty-Second Claim For Relief
### (incorporating all previous allegations)

324.    The Tereza One Year Transfers were made with the actual intent to hinder, delay, or defraud Allou's creditors.

325.    By reason of the foregoing, the Trustee is entitled to a judgment (a) avoiding the Tereza One Year Transfers pursuant to Bankruptcy Code §548; and (b) setting aside the Tereza One Year Transfers.

326.    Tereza is the initial or immediate transferee of the Tereza One Year Transfers within the meaning of 11 U.S.C. §550(a) and, therefore, the Trustee may recover from Tereza an amount as yet undetermined, but in no event less than the sum of $4,513,224.45, together with interest thereupon.

### Twenty-Third Claim For Relief
### (incorporating all previous allegations)

327.    The Tereza Preferential Transfers were made by Allou within 90 days before the Filing Date.

328.    The Tereza Preferential Transfers constitute a transfer of an interest of property of Allou.

329.    Upon information and belief, the Tereza Preferential Transfers were made to, or for the benefit of, Tereza, a creditor.

330.    The Tereza Preferential Transfers were made while Allou was insolvent.

331.    Upon information and belief, Allou made the Tereza Preferential Transfers for, or on account of, antecedent debts (the "Debt") owed by Allou to Tereza prior to the dates on which the Tereza Preferential Transfers were made.

332.    The Tereza Preferential Transfers enabled Tereza to receive more than it would have received: (i) in the substantively consolidated Allou chapter 7 cases; (ii) if the Tereza Preferential Transfers had not been made; and (iii) if Tereza had received payment of the Debt to the extent provided by the Bankruptcy Code.

333.    The Tereza Preferential Transfers constitute avoidable transfers pursuant to §547(b) of the Bankruptcy Code and, in accordance with §550(a) of the Bankruptcy Code, Plaintiff may recover the amount of the Tereza Preferential Transfers, plus interest from the date of demand.

334.    Based upon the foregoing, the Trustee requests entry of judgment: (i) avoiding the Transfers; and (ii) in the sum of $278,448.60, plus interest from the date of demand.

**Twenty-Fourth Claim For Relief**
**(incorporating all previous allegations)**

335.    The Morgren Transfer was made in furtherance of the fraud and with the actual intent to hinder, delay or defraud creditors.

336.    As a result of the Jacobs Family's fraud at Allou, the Trustee is entitled to judgment (a) avoiding the Morgren Transfer pursuant to New York State Debtor & Creditor Law §276 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the Morgren Transfer set aside, (c) may recover from Morgren an amount as yet undetermined but in no event less than $600,000.00 plus appropriate interest thereon and may recover attorneys' fees pursuant to New York Debtor and Creditor Law §276-a.

### Twenty-Fifth Claim For Relief
### (incorporating all previous allegations)

337.    Upon information and belief, at the time of the Morgren Transfer, Allou was insolvent or was rendered insolvent by the Morgren Transfer.

338.    The Morgren Transfer constituted a fraudulent conveyance in violation of New York Debtor and Creditor Law §273.

339.    By reason of the foregoing, under Bankruptcy Code §544(b), plaintiff is entitled to a judgment (a) avoiding the Morgren Transfer pursuant to New York Debtor and Creditor Law §273 and 11 U.S.C. §§550(a) and 551, (b) may have the Morgren Transfer set aside, and (c) may recover from Morgren an amount as yet undetermined but in no event less than $600,000.00 plus appropriate interest thereon.

### Twenty-Sixth Claim For Relief
### (incorporating all previous allegations)

340.    Upon information and belief, at the time of the Morgren Transfer, Allou was engaged or about to engage in a business or transaction for which the property remaining in its possession after the conveyance was unreasonably small capital.

341.    The Morgren Transfer constituted a fraudulent conveyance in violation of New York Debtor and Creditor Law §274.

342.    By reason of the foregoing, under Bankruptcy Code §544(b), plaintiff is entitled to a judgment (a) avoiding the Morgren Transfer pursuant to New York Debtor and Creditor Law §274 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the Morgren Transfer set aside, and (c) may recover from Morgren an amount as yet undetermined but in no event less than $600,000.00 plus appropriate interest thereon.

**Twenty-Seventh Claim For Relief**
**(incorporating all previous allegations)**

343.    Upon information and belief, at the time of the Morgren Transfer, Allou had incurred, was intending to incur or believed that it would incur debts beyond its ability to pay them as they matured.

344.    The Morgren Transfer constituted a fraudulent conveyance in violation of New York Debtor and Creditor Law §275.

345.    By reason of the foregoing, under Bankruptcy Code §544(b), plaintiff is entitled to a judgment (a) avoiding the Morgren Transfer pursuant to New York Debtor and Creditor Law §275 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the Morgren Transfer set aside, and (c) may recover from Morgren an amount as yet undetermined but in no event less than $600,000.00, plus appropriate interest thereon.

**Twenty-Eighth Claim For Relief**
**(incorporating all previous allegations)**

346.    The Morgren Transfer was an impermissible transfer of Allou's funds, a result of which Morgren was an ultimate beneficiary of the such transfer under circumstances in which it would be unjustly enriched if Morgren were to retain such proceeds since Allou did not receive reasonable equivalent value for such transfers.

347.    As a result of the fraud described herein, Morgren has been unjustly enriched and may not in equity and good conscience retain the Morgren Transfer.

348.    By reason of the foregoing, Morgren is liable for unjust enrichment to the Trustee in an amount as yet undetermined but in no event less than $600,000.00 plus appropriate punitive damages and interest.

WHEREFORE, plaintiff Kenneth P. Silverman, Esq., the chapter 7 Trustee demands judgment Defendants, H.I.L. Associates Ltd., Hills Merchandising Corp., Tereza Merchandising and Morgren Corp.:

(a)     on the Trustee's first claim for relief for aiding and abetting the waste and mismanagement of the Allou's assets by the Jacobs Family and the breach of their fiduciary duties in the sum of an amount as yet undetermined but in no event less than $200,000,000 plus appropriate interest thereon;

(b)     on the Trustee's second claim for relief for a judgment in the sum of an amount as yet undetermined but in no event less than $200,000,000 plus appropriate interest thereon for compensatory, consequential, exemplary, punitive, expectation, and incidental damages, plus interest, arising from the Defendants' active participation in the intentional torts and fraud committed by the Jacobs Family against Allou and the creditors of Allou;

(c)     on the Trustee's third claim for relief for relief for a judgment in the sum of an amount as yet undetermined but in no event less than $200,000,000 plus appropriate interest thereon for compensatory, consequential, exemplary, punitive, expectation, and incidental damages, plus interest, arising from the Defendants' active participation in the fraud committed perpetrated against Allou and its creditors;

(d)     on the Trustee's fourth claim for relief (a) avoiding the H.I.L. Transfers pursuant to New York Debtor and Creditor Law §276 and pursuant to 11 U.S.C. §§544(b), 550(a) and 551, (b) may have the H.I.L. Transfers set aside, and (c) may recover from H.I.L. an amount as yet undetermined but in no event less than $17,615,822.69 plus appropriate interest thereon and attorneys' fees pursuant to New York Debtor and Creditor Law §276-a ;

(e)     on the Trustee's fifth claim for relief (a) avoiding the H.I.L. Transfers pursuant to New York Debtor and Creditor Law §273 and pursuant to 11 U.S.C. §§544(b), 550(a) and 551, (b) may have the H.I.L. Transfers set aside, and (c) may recover from H.I.L. an amount as yet undetermined but in no event less than $17,615,822.69 plus appropriate interest thereon;

(f)     on the Trustee's sixth claim for relief (a) avoiding the H.I.L. Transfers pursuant to New York Debtor and Creditor Law §274 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the H.I.L. Transfers set aside, and (c) may recover from H.I.L. an amount as yet undetermined but in no event less than $17,615,822.69 plus appropriate interest thereon;

(g)     on the Trustee's seventh claim for relief (a) avoiding the H.I.L. Transfers pursuant to New York Debtor and Creditor Law §275 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the H.I.L. Transfers set aside, and (c) may recover from H.I.L. an amount as yet undetermined but in no event less than $17,615,822.69 plus appropriate interest thereon;

(h)     on Trustee's eighth claim for relief against H.I.L. in an amount, as yet undetermined but in no event less than, $17,615,822.69 for unjust enrichment, plus appropriate punitive damages and interest;

(i)     on the Trustee's ninth claim for relief (a) avoiding the H.I.L. One Year Transfers pursuant to 11 U.S.C. §§548, 550(a) and 551, (b) may have the H.I.L. One Year Transfers set aside, and (c) may recover from H.I.L. an amount as yet undetermined but in no event less than $943,348.64 plus appropriate interest thereon;

(j)     on the Trustee's tenth claim for relief (a) avoiding the H.I.L. One Year Transfers pursuant to 11 U.S.C. §§548, 550(a) and 551, (b) may have the H.I.L. One Year Transfers set aside, and (c) may recover from H.I.L. an amount as yet undetermined but in no event less than $943,348.64 plus appropriate interest thereon;

(k)     on the Trustee's eleventh claim for relief (a) avoiding the Hills Merch. Transfers pursuant to New York Debtor and Creditor Law §276 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the Hills Merch. Transfers set aside, (c) may recover from Hills Merch. an amount as yet undetermined but in no event less than $3,712,670.00 plus appropriate interest thereon and may recover attorneys' fees pursuant to New York Debtor and Creditor Law §276-a;

(l)     on the Trustee's twelfth claim for relief (a) avoiding the Hills Merch. Transfers pursuant to New York Debtor and Creditor Law §273 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the Hills Merch. Transfers set aside, and (c) may recover from Hills Merch. an amount as yet undetermined but in no event less than $3,712,670.00 plus appropriate interest thereon;

(m)     on the Trustee's thirteenth claim for relief (a) avoiding the Hills Merch. Transfers pursuant to New York Debtor and Creditor Law §274 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the Hills Merch. Transfers set aside, and (c) may recover from Hills Merch. an amount as yet undetermined but in no event less than $3,712,670.00 plus appropriate interest thereon;

(n)     on the Trustee's fourteenth claim for relief (a) avoiding the Hills Merch. Transfers pursuant to New York Debtor and Creditor Law §275 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the Hills Merch. Transfers set aside, and (c) may recover from Hills Merch. an amount as yet undetermined but in no event less than $ 3,712,670.00 plus appropriate interest thereon;

(o)     on Trustee's fifteenth claim for relief against Hills Merch. in an amount, as yet undetermined but in no event less than, $3,712,670.00 for unjust enrichment, plus appropriate punitive damages and interest;

(p)     on the Trustee's sixteenth claim for relief (a) avoiding the Tereza Transfers pursuant to New York Debtor and Creditor Law §276 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the Tereza Transfers set aside, (c) may recover from Tereza an amount as yet undetermined but in no event less than $11,250,753.73 plus appropriate

interest thereon and may recover attorneys' fees pursuant to New York Debtor and Creditor Law §276-a;

(q)     on the Trustee's seventeenth claim for relief (a) avoiding the Tereza Transfers pursuant to New York Debtor and Creditor Law §273 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the Tereza Transfers set aside, and (c) may recover from Tereza an amount as yet undetermined but in no event less than $11,250,753.73 plus appropriate interest thereon;

(r)     on the Trustee's eighteenth claim for relief (a) avoiding the Tereza Transfers pursuant to New York Debtor and Creditor Law §274 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the Tereza Transfers set aside, and (c) may recover from Tereza an amount as yet undetermined but in no event less than $11,250,753.73 plus appropriate interest thereon;

(s)     on the Trustee's nineteenth claim for relief (a) avoiding the Tereza Transfers pursuant to New York Debtor and Creditor Law §275 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the Tereza Transfers set aside, and (c) may recover from Tereza an amount as yet undetermined but in no event less than $11,250,753.73 plus appropriate interest thereon;

(t)     on the Trustee's twentieth claim for relief against Tereza in an amount, as yet undetermined but in no event less than, $11,250,753.73 for enrichment, plus appropriate punitive damages and interest;

(u)     on the Trustee's twenty-first claim for relief (a) avoiding the Tereza One Year Transfers pursuant to 11 U.S.C. §§548, 550(a) and 551, (b) may have the Tereza One Year Transfers set aside, and (c) may recover from Tereza an amount as yet undetermined but in no event less than $4,513,224.45 plus appropriate interest thereon;

(v)     on the Trustee's twenty-second claim for relief (a) avoiding the Tereza One Year Transfers pursuant to 11 U.S.C. §§548, 550(a) and 551, (b) may have the Tereza One Year Transfers set aside, and (c) may recover from Tereza an amount as yet undetermined but in no event less than $4,513,224.45 plus appropriate interest thereon;

(w)     on Trustee's twenty-third claim for relief (a) avoiding the Tereza Preferential Transfers pursuant to 11 U.S.C. §§547(b) and 550(a), and (b) awarding the Trustee judgment in an amount equal to the Tereza Preferential Transfers and directing Tereza to immediately pay the Trustee an amount no less than $278,448.60 pursuant to §550(a) of the Bankruptcy Code, together with appropriate interest thereon;

(x)     on the Trustee's twenty-fourth claim for relief (a) avoiding the Morgren Transfer pursuant to New York Debtor and Creditor Law §276 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the Morgren Transfer set aside, (c) may recover from Morgren an amount as yet

undetermined but in no event less than $600,000.00 plus appropriate interest thereon and may recover attorneys' fees pursuant to New York Debtor and Creditor Law §276-a;

(y)  on the Trustee's twenty-fifth claim for relief (a) avoiding the Morgren Transfer pursuant to New York Debtor and Creditor Law §273 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the Morgren Transfer set aside, and (c) may recover from Morgren an amount as yet undetermined but in no event less than $600,000.00 plus appropriate interest thereon;

(z)  on the Trustee's twenty-sixth claim for relief (a) avoiding the Morgren Transfer pursuant to New York Debtor and Creditor Law §274 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the Morgren Transfer set aside, and (c) may recover from Morgren an amount as yet undetermined but in no event less than $600,000.00 plus appropriate interest thereon;

(aa)  on the Trustee's twenty-seventh claim for relief (a) avoiding the Morgren Transfer pursuant to New York Debtor and Creditor Law §275 and pursuant to 11 U.S.C. §§550(a) and 551, (b) may have the Morgren Transfer set aside, and (c) may recover from Morgren an amount as yet undetermined but in no event less than $600,000.00 plus appropriate interest thereon;

(bb)  on Trustee's twenty-eighth claim for relief against Morgren in an amount, as yet undetermined but in no event less than, $600,000 for unjust enrichment, plus appropriate punitive damages and interest;

(cc)  for such other relief as the Bankruptcy Court deems proper.

Dated: Jericho, New York
　　　　November 23, 2005

**SILVERMAN PERLSTEIN & ACAMPORA LLP**
Attorney for Plaintiff Kenneth P. Silverman, Esq., as Chapter 7 Trustee

By:　/s/ Edward M. Flint
　　　Edward M. Flint, Esq. (EMF#7001)
　　　A Member of the Firm
　　　100 Jericho Quadrangle, Suite 300
　　　Jericho, New York 11753
　　　(516) 479-6300